### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **No. 1:21-cr-00350-PLF** |
| | : | |
| **ANTIONNE BRODNAX,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum where the defendant, Antionne Brodnax--without concessions from the government and without a plea agreement--has pled guilty to all counts of a four-count Information charging him with:  entering and remaining in a restricted building, in violation of 18 U.S.C. § 1752(a)(1) (Count One); disorderly and disruptive conduct in a restricted building, in violation of 18 U.S.C. § 1752(a)(2) (Count Two); disorderly conduct in the Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Three); and parading and demonstrating in the Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(E) (Count Four).

The government recommends that the Court sentence the defendant at the low end of the applicable Sentencing Guidelines range, 21 months.  The defendant was on probation for a prior felony conviction when he committed the offenses, and the heightened Sentencing Guidelines range is driven by  Brodnax's significant criminal history. The Court should also impose a one-year term of supervised release and order the defendant to pay $500 in restitution.

### I.    Introduction

As this Court is aware, the charges in this case all relate to the violent attack on the Capitol that took place on January 6, 2021.  The attack interrupted the certification of the 2020

Electoral College vote count, injured more than one hundred law enforcement officers, resulted in the deaths of four individuals, and caused more than one million dollars in property damage.

While the defendant did not himself engage in violence or directly cause property damage, he entered the Capitol building that day as part of the mob.  And he did so through a doorway that had been violently breached by other rioters less than 25 minutes earlier.  While in the building he trespassed through a variety of hallways and rooms, and twice pushed through lines of police trying to prevent him and others from proceeding further.  He was in the Capitol for a total of approximately 45 minutes and once outside, defiantly sat on the hood of a U.S. Capitol Police (USCP) vehicle and posed for a photograph.

## II.        Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

The Capitol is secured 24 hours a day by the USCP.  Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP officers.  Only authorized people with appropriate identification are allowed access inside the Capitol.  On January 6, 2021, the exterior plaza of the Capitol was also closed to members of the public, as a joint session of the United States Congress convened inside.  During the session, elected members of the United States House of Representatives and the United States Senate were meeting to certify the vote count of the Electoral College of the 2020 Presidential Election.  The joint session began at approximately 1:00 p.m.  By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.  As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence still presiding over the Senate, a large crowd gathered outside the Capitol. As noted above,

temporary and permanent barricades were in place around the exterior of the Capitol, USCP were present and attempting to keep the crowd away from the building and the proceedings underway inside.

As the certification proceedings were still underway, the exterior doors and windows of the Capitol were locked or otherwise secured.  USCP officers attempted to maintain order and keep the crowd from entering the Capitol.  However, shortly after 2:00 p.m., individuals in the crowd forced entry into the Capitol, including by breaking windows and assaulting USCP members, as others in the crowd encouraged and assisted them.

Shortly thereafter, at approximately 2:20 p.m. members of the House of Representatives and Senate, including the President of the Senate, Vice President Mike Pence, were instructed to --and did--evacuate the House and Senate chambers.  At approximately 2:43 p.m., a USCP officer fatally shot one of the rioters, Ashli Babbitt, after she disobeyed the officer's verbal commands to stay back and climbed through a window in the Speaker's Lobby near the House chamber.

As a result of the riot, the Congressional proceedings were suspended from approximately 2:20 p.m. until shortly after 8:00 p.m.

During national news coverage of these events, video recorded by persons who were present on the scene emerged that depicted numerous violations of local and federal law, including assaults on police officers, destruction and theft of government property, and scores of individuals inside the Capitol without authority to be there.

*Background of the Defendant*

The defendant, age 39, is from the Richmond, Virginia area and is a part-time rap-music artist and also runs an apparel company.  The government would not be seeking a twenty-one month prison sentence in this case absent the defendant's  substantial criminal history, resulting

in a Criminal History Category IV.  His first felony conviction resulted from an arrest for

possession of a controlled substance in 2000 and his probation was revoked twice thereafter.

Draft Presentence Report at ¶ 44.  He has felony criminal convictions in Virginia state court for

possession of a controlled substance (5/30/2001), robbery (9/20/2001),[1] and manufacturing a

controlled substance and providing for the resale of drugs (two counts, 4/18/2017).  Id. at ¶¶ 44,

45, and 48.  He also has a prior felony conviction from the U.S. District Court in Greenbelt, Md.,

for possession of a firearm after having been convicted of a felony offense (4/13/2006).  Id. at

¶ 46.  And he has a Virginia state court misdemeanor conviction for unlawful possession of drug

paraphernalia (12/6/2007).  Id. at ¶ 47.

Significantly, only three of the defendant's six adult convictions resulted in criminal

history points, meaning that his criminal history category of IV arguably understates the severity

of his criminal history.  Id. at ¶¶ 44-52.  In addition, in 2009 he was sentenced to 24 months'

incarceration for a violation of the conditions of supervised release involving two separate

incidents involving police contact, an alleged shooting and vehicle stop, and his unexplained

possession of $2000 in cash while inside a vehicle containing half a kilogram of cocaine, a

firearm, and another $10,000 in cash.  Id. at ¶ 46.

*The Defendant's Entry Into The Capitol*

The defendant entered the Capitol building at approximately 2:23 p.m. through the Senate

Wing door on the west side of the building, which door had been violently breached at

approximately 2 p.m.  The still image below, from a USCP closed-circuit video recording, shows

---

[1]According to the draft PSR, National Crime Information Center (NCIC) records reflect the defendant was also charged with one count of Use or Display Firearm in Commission of Felony, which was dismissed.  Draft Presentence Report at ¶ 45.

the defendant and other rioters walking through that doorway, as other rioters climb through the large windows located on each side.



Another USCP CCTV camera points generally toward that doorway from the outside. The image below shows the view from that camera at approximately the same moment the defendant entered, with the doorway the defendant entered through indicated by the arrow.  As the image shows, the area was crowded with other rioters when the defendant entered the building.



*The Defendant's Actions in the Capitol*

After making entry the defendant proceeded into the Rotunda, where he was captured again by a USCP CCTV camera. A still image from that video showing the defendant, apparently taking a "selfie" immediately after entering the Rotunda, appears below.



The defendant then left the Rotunda by walking to the doorway on his left where he proceeded into Statuary Hall.  At that location he casually stepped over a rope line meant to restrict the movements of visitors during periods when visits are authorized, so a companion could photograph him sitting at the base of a statue, as shown in the two images below.

From USCP CCTV





A few minutes later the defendant proceeded further into the building, into a hallway known as the Statuary Hall Connector, joining a crowd of rioters who were blocked from proceeding further by members of law enforcement.  A still image below, from a USCP CCTV camera, shows the defendant as he approaches that area.



Over the next several minutes the defendant gradually worked his way to the front of the crowd in the Statutory Hall Connector as more rioters filled the area.  The USCP CCTV image below is from six minutes later and shows the defendant near the front of the group, which had swelled with many additional rioters, as they confront the line of police officers trying to hold them back.



The government has obtained a social media video file, which unlike the USCP CCTV recordings includes an audio component, for the same area and time period.  That evidence shows that while the defendant was moving forward, and the crowd was growing, the rioters were angrily yelling at the police.  One rioter in particular, a woman at the front who was just a few feet away from the defendant, can be heard yelling:  "Tell [House Speaker Nancy] Pelosi we're coming for that b*tch!   Tell f*cking Pelosi we're coming for her—f*cking traitor c*nt! F*cking traitor c*nt, we're coming for her!"

Below is the same image as above, with the woman identified by a red line drawn around her head.



The two still images from the social media video file that appear below were recorded within the same short time period when the woman made those remarks. The defendant and the woman do not appear together in those still shots because the person holding the recording device pivoted the device rapidly during that time period.

In the first image the woman is identified by a red arrow.  A U.S. flag is visible a few feet behind her.



Less than a second later the camera swings to the woman's left.  The defendant is now visible in the foreground on the left side of the frame.  The same flag that was in the first image is in the foreground on the right side. Those still shots and the accompanying audio recording demonstrate that Brodnax was fully aware of the violent and inciting remarks of other rioters while he was inside the Statutory Hall Connector.



A few minutes later the crowd of rioters, including the defendant, surged through the police line, with rioters just a few feet in front of him physically pushing police officers out of the way.

The crowd, including the defendant, then went forward about 30 feet, toward a closed and locked door that leads to the House chamber.  For the next several minutes, the crowd, again including the defendant, massed in front of the door.  A social media recording obtained by the government shows that during this period the crowd chanted, "Stop the steal!" and "Break it down!"  A still image from that recording, during a moment when the crowd is chanting "Break it down," appears below.  As the image shows, the defendant (beneath the wide blue arrow) is recording the event on his phone, which he is holding above him in his left hand (beneath the narrow blue arrow).



After about 10 more minutes--a time period that includes the moment a USCP member fatally shot Ms. Babbitt not too far from the defendant's location, and after law enforcement members deployed riot control irritant against the defendant and other rioters in his group--the defendant finally retreated back through Statuary Hall.  The image below, from USCP CCTV, shows the defendant leaving the area of the doorway that the group he was with tried to break down, and also shows smoke from the irritant deployed by law enforcement.



The defendant then continued walking to Statuary Hall itself, as shown in the USCP CCTV image below.



The defendant finally exited the building at approximately 3:06 p.m., as shown in the USCP CCTV image below.





The defendant would later use the image on the cover of a rap music album, which includes tracks with titles that reference the attack on the Capitol.  One of the tracks is a recording of an unknown subject interviewing the defendant and includes the interviewer asking him, "Why was you in the Capitol?"  The defendant's response: "Cause I felt like it."  The defendant and the interviewer then both laughed.

*The Defendant's Pre-arrest Interview*

On January 15, 2021, FBI agents interviewed the defendant at a residence in Richmond. During the interview the defendant acknowledged he had entered the Capitol on January 6.  He claimed, however, that he only entered the Capitol after the police had removed gates that were blocking the doors.  He further claimed that that the experience was like a school field trip for him and that he did not witness any violence while in the building.  He also acknowledged having made recordings on his iPhone of events in the Capitol while he was in the building.  He declined to consent to a search of his iPhone but told the interviewing agents he would provide those recordings to them later via email.  He made no mention of being among a crowd that included a woman threatening the House Speaker or among a group chanting to break down a door to the House chamber.  And he made no mention of being present when police deployed a riot control irritant.

The interviewing agent later sent a text to the defendant inquiring about getting the videos.  In his response the defendant re-affirmed he would send them soon.  After several days, the agent sent him another text inquiring about the videos.  The defendant never responded and never sent the videos.

*The Defendant's Arrest*

On February 2, 2021, a complaint was issued charging the defendant with the same offenses that would later be filed against him by information.  The defendant was arrested on March 11, 2021, at a residence in the Richmond area.  When arrested, he was in possession of an iPhone that was seized and searched.  A forensic search of the iPhone, including an examination of the SIM card, and a review of phone records, confirmed that the seized iPhone had been continuously associated with the defendant since mid-2020 and was inside the Capitol on January 6.  However, there were no recordings on the phone of the events in the Capitol on January 6.

### III.     Statutory Penalties

For Count One and Count Two the defendant faces, for each count, a statutory maximum of one year in prison followed by a period of supervised release of up to one year.  18 U.S.C. §§ 1752(b)(2), 3583(b)(3).  For Count Three and Count Four he faces, for each count, a statutory maximum of six months in prison, 40 U.S.C § 5109(b); no supervised release may be imposed for these counts, as they are both petty offenses.  See 18 U.S.C. §§ 19, 3559(a)(7), 3583(b)(3).  By statute the prison terms may run consecutively, id. § 3584(a), but if the Court imposes multiple terms of supervised release those terms must run concurrently, id. § 3624(e).

The defendant also faces a potential maximum fine of $100,000 for each of the one-year counts, id. § 3571(b)(5), and a potential maximum fine of $5000 for each of the petty offense counts, id. § 3559(a)(7), 3571(b)(6).  The defendant is also subject to restitution under 18 U.S.C. § 3663.

### IV.     The Sentencing Guidelines

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." United States v. Gall, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. Id. at 49. The United States Sentencing Guidelines ("the Guidelines" or "U.S.S.G.") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. Id. at 49.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." Rita v. United States, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" Kimbrough v. United States, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." Kimbrough, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." Id. at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing
> Commission's in-depth research into prior sentences, presentence
> investigations, probation and parole office statistics, and other data.
> U.S.S.G. §1A1.1, intro, comment 3. More importantly, the
> Guidelines reflect Congress's determination of potential
> punishments, as set forth in statutes, and Congress's on-going
> approval of Guidelines sentencing, through oversight of the

22

> Guidelines revision process.  See 28 U.S.C. § 994(p) (providing for
> Congressional oversight of amendments to the Guidelines).  Because
> the Guidelines reflect the collected wisdom of various institutions,
> they deserve careful consideration in each case.  Because they have
> been produced at Congress's direction, they cannot be ignored.

United States v. Goff, 501 F.3d 250, 257 (3d Cir. 2005).  "[W]here judge and Commission *both*

determine that the Guidelines sentences is an appropriate sentence for the case at hand, that

sentence likely reflects the [18 U.S.C. ]§ 3553(a) factors (including its 'not greater than

necessary' requirement)," and that *significantly* increases the likelihood that the sentence is a

reasonable one."  Rita, 551 U.S. at 347 (emphasis in original).  In other words, "the

Commission's recommendation of a sentencing range will 'reflect a rough approximation of

sentences that might achieve § 3553(a)'s objectives.'"  Kimbrough, 552 U.S. at 89.

The Sentencing Guidelines are applicable only to Counts One and Two.  *See* U.S.S.G.

§ 1B1.9.  The applicable guideline for Count One, which charges a violation of 18 U.S.C.

§ 1752(a)(1), is U.S.S.G. § 2B2.3.  U.S.S.G. Appx. A (Statutory Index; listing two potential

applicable guidelines, U.S.S.G.  §§ 2A2.4 and 2B2.3, for violations of 18 U.S.C. § 1752, without

reference to statute's subdivisions); see also United States v. Jabr, 2019 WL 6135456, at *1

(D.D.C., Sept. 19, 2019) (where this Court applied U.S.S.G. § 2B2.3 to a conviction under 18

U.S.C. § 1752(a)(1)).   Under that Guideline, the Base Offense Level is 4.  U.S.S.G. § 2B2.3(a).

The Guideline also sets out several specific offense characteristics that require a 2-level increase,

including where the offense "occurred . . . at any restricted building or grounds," *id*.

§ 2B2.3(b)(1(A)(vii), which is applicable here, thus raising the Offense Level to 6.

The applicable guideline for Count Two, which charges a violation of 18 U.S.C.

§ 1752(a)(2), is U.S.S.G. § 2A2.4.  The U.S.S.G. Statutory Appendix provides two potentially

applicable guideline provisions for a violation of 18 U.S.C. § 1752:  USSG § 2A2.4 (Obstructing

or Impeding Officers) and USSG § 2B2.3 (Trespass).  The "most appropriate" potentially

applicable guideline provision is the one that best reflects the "offense conduct charged" in the

count of conviction.  U.S.S.G. § 1B1.2 app. n.1; accord id. § 1B1.2(a).  Here, the Information

charges that the defendant knowingly engaged in disruptive conduct where that conduct "in fact"

impeded and disrupted government business (ECF doc. # 12, at 2).  Because a defendant cannot

"in fact" impede government business without also impeding and obstructing officers—as the

defendant here did—the most appropriate guideline is U.S.S.G. § 2A2.4.  The Base Offense

Level for that Guideline is 10. U.S.S.G. § 2A2.4(a).[2]

The Court must then determine whether to apply any adjustments to the offense levels for

Counts One and Two "related to victim, role, and obstruction of justice, from parts A, B, and C [,

respectively] of Chapter 3 [of the Guidelines]." U.S.S.G. § 1B1.1(a)(3).  The government

submits that the defendant's deletion of relevant recordings from his iPhone supports an upward

adjustment of two levels under U.S.S.G. § 3C1.1  for "Obstructing or Impeding the

Administration of Justice."  That provision provides:

> If (1) the defendant willfully obstructed or impeded, or attempted
> to obstruct or impede, the administration of justice with respect to
> the investigation, prosecution, or sentencing of the instant offense
> of conviction, and (2) the obstructive conduct related to (A) the
> defendant's offense of conviction and any relevant conduct; or (B)
> a closely related offense, increase the offense level by 2 levels.

Id. § 3C1.1.

---

[2]By letter to the Probation Office on January 6, 2022, the government stated its objections to the draft presentence report.  Among those was an objection to the draft PSR's failure to recommend a three-level enhancement because the offense involved physical force, pursuant to U.S.S.G.  § 2A2.4(b)(1)(A).  On further review, the government has concluded that that enhancement should not be applied and thus withdraws the objection.

The Application Notes to the Obstruction Guideline provide examples of conduct deserving of the upward adjustment, including:

> destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so.

Id. § 3C1.1 app. n. 4.

The evidence demonstrates that defendant knowingly destroyed evidence that was material to the investigation of the events on January 6, namely videos that he recorded with his iPhone inside the Capitol on January 6, after law enforcement officials became aware of those recordings and asked defendant to turn them over.  Specifically, as discussed above, the video evidence, which the government will play at the sentencing hearing, shows the defendant holding up his illuminated phone and pointing it toward a doorway leading to the House chamber, and toward other rioters who are chanting, "Break it down!"  Consistent with this video evidence, defendant later confirmed, when interviewed by law enforcement officials, that he had videos on his phone recording events inside the Capitol during the riot.  The law enforcement officials asked defendant to provide them with those recordings, and defendant agreed and said he would email them to the officials but did not comply despite multiple requests.  See Exhibit 1 (copies of redacted FBI FD-302s, describing defendant's admissions).  And when his phone was subsequently seized and searched, no such video was on it.

As this Court is likely well aware, and as this case itself demonstrates, audio-video recordings made by the Capitol rioters themselves on their smartphones are an important source of evidence against the rioters.  Although USCP CCTV cameras also provide video evidence of events in the Capitol that day, those recordings do not include audio and do not capture every

angle.  And while MPD officers who responded to the Capitol that day were equipped with body-worn cameras--which record audio and video--USCP officers are not issued body-worn cameras.  Significantly, in this case, the only officers near the defendant when he committed his most egregious conduct—in the Statuary Hall Connector and near the House chamber doorway—were USCP officers.

The government submits that there is far more than a preponderance of evidence that the defendant recorded videos while in the Capitol on January 6, 2021, and then deleted them after law enforcement agents asked for them.  At least one of those videos, the available evidence shows, was of rioters attempting to break down a doorway leading to the House chamber.  Such evidence was certainly material to the investigation of those particular rioters.  See United States v. Smaw, 993 F.2d 902, 904 (D.C. Cir. 1993) (affirming application of § 3C1.1 adjustment where defendant omitted from her financial disclosure form for sentencing her recent purchase of a house, even though she claimed she had not yet acquired any equity in the house).  Accordingly, with the two-level enhancement for obstruction of justice, the Total Offense Level for Count One is 8 and for Count Two is 12.

The next step is to apply the provisions governing multiple counts of conviction. See U.S.S.G. Chapter 3, part D.  Multiple counts of convictions "group" if they "involve substantially the same harm."  U.S.S.G. § 3D1.2.  They do so under four circumstances, including:

(a) When counts involve the same victim and the same act or transaction.

(b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

U.S.S.G. § 3D1.2(a) and (b).[3]  "For offenses in which there are no identifiable victims (e.g., drug or immigration offenses, where society at large is the victim), the 'victim' for purposes of subsections (a) and (b) is the societal interest that is harmed." Id. § 3D1.2, cmt. n.2.  "In such cases, the counts are grouped together when the societal interests that are harmed are closely related." Id.

Sections 1752(a)(1) and (a)(2) do not group because the latter victimizes individual persons and the former victimizes a societal interest.  Violations of § 1752(a)(2) have individual victims because one cannot impede or disrupt government business or official functions by say of disorderly or disruptive conduct without obstructing the official conduct of one or more government officials tasked with carrying out that business or functions.  Simply put, one cannot violate § 1752(a)(2) without obstructing the work of an actual person.

Violations of § 1752(a)(1), on the other hand, can be committed without affecting any individuals. The crime occurs when the defendant enters or remains in a restricted area, which can take place when no one else is nearby or even a witness to the offense.  For such crimes, the "victim" is the societal interest in preventing trespass onto government property. Because the victims are different, grouping should not occur.  See generally United States v. Hasan, 586 F.3d 161, 169 (2d Cir. 2009) (in prosecution for international parental kidnapping, "victims of the kidnapping and conspiracy to kidnap were the same [the kidnapped child and his mother], whereas "society at large … the victim of Hasan's passport fraud"); United States v. Napoli, 179 F.3d 1, 7 (2d Cir. 1999) ("victims of fraud counts are those persons who have lost

---

[3]Two other circumstances in which counts group do not apply to violations of either 1752(a)(1) and (a)(2). First, each violation does not "embody conduct that is treated a specific offense characteristic in, or adjustment to, the guideline applicable to" the other violation.  U.S.S.G. § 3D1.2(c).  Second, the offense level for violations of § 1752(a)(1) or (a)(2) are not "determined largely on the basis of the total amount of harm or loss." Id. § 3D1.2(d).

money or property as a direct result of the fraud"; the "'victim' of money laundering is, by contrast, ordinarily society at large); United States v. Rudolph, 137 F.3d 173, 181 (3d Cir. 1998) ("primary societal interests jeopardized by Rudolph's acceptance of the bribes was the integrity and efficacy of the nation's immigration policies, arguably a victimless crime," whereas "theft of [a presentence report] was directed to an identifiable victim-the individual for whom the PSR was prepared"); United States v. Toler, 901 F.2d 399, 403 (4th Cir. 1990) (interstate transportation of child pornography and interstate transportation of a minor with intent to engage in prohibited sexual conduct involved different victims for purposes, even though the same minor was involved in both: the primary victim of the transportation of a minor count was the minor, whereas the primary victim of the child pornography count was society in general).

Counts One and Two do not "group" because they do not "involve substantially the same harm."  U.S.S.G.. § 3D1.2.  And under U.S.S.G. § 3D1.4, each Count of conviction is a single Unit because they are within three offense levels of each other.  Pursuant to the table set out in that Guideline, the Combined Offense Level for the two counts is determined by adding two levels to the Unit with the higher level, i.e., the Unit that is Count Two, which yields a Combined Offense Level of 14.

Finally, applying the two-level downward adjustment for acceptance of responsibility, U.S.S.G. § 3E1.1, the Total Adjusted Offense Level is 12.

The government concurs with the draft Presentence Investigation Report that the defendant has 9 criminal history points, which puts him in Criminal History Category IV.  Under U.S.S.G. Ch 5, Pt. A (Sentencing Table), the defendant therefore faces an overall guidelines term of imprisonment of 21 to 27 months.  Under U.S.S.G.  § 5E1.2(c) the defendant's Adjusted Offense Level of 12 produces a guideline fine range of $5500 to $55,000.

Here, while the Court must balance all of the factors under 18 U.S.C. § 3553(a) to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness.

## V.      Sentencing Factors Under 18 U.S.C. § 3553(a)

In formulating the sentence in this case, the Court must consider the nature and circumstances of the offense and the history and characteristics of the defendant; and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . 18 U.S.C. § 3553(a). The Court must also consider the kinds of sentences available; the kinds of sentence and the sentencing range established for the offenses under the U.S. Sentencing Guidelines; pertinent policy statements of the Guidelines; the need to avoid unwarranted sentencing disparities; and the need to provide restitution. Id. As shown below, each of those factors weigh in favor of a Guidelines sentence.

*The Nature and Circumstances of the Offense*

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of

the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances.  As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob.  Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, the Court must assess such conduct on a spectrum.  This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include:  (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition.  While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to his or her fair and just punishment.

To be clear, had the defendant personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct.  The absence of

violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish the defendant from most other misdemeanor defendants.  The defendant's lack of violence and property destruction explains why he was charged only with misdemeanors.

In this case the defendant entered the Capitol through a doorway that had been violently breached only 23 minutes before.  He then joined other rioters who were confronting police and trying to breach a police line.  When the rioters in the front of this group physically pushed aside the officers, the defendant willingly moved forward as well.  He then joined the group as they attempted to breach a doorway to the House chamber.  Only after a chemical irritant was deployed by the officers, did the defendant retreat and exit the Capitol building.

Once outside the Capitol, Brodnax mockingly posed for a photograph of himself sitting on a police vehicle.  Within a few days, after some news of the death and destruction associated with the riot became available to the public, he recorded himself laughing about his participation by declaring that he had entered the Capitol because he felt like it.  Prior to his arrest, he attempted to profit from the riot by releasing a rap album that used the attack on the Capitol as a theme.  And finally, he deleted recordings on his phone that he had made while in the Capitol.  This conduct merits a sentence of incarceration.

*The History and Characteristics of the Defendant*

As described above, Brodnax has had numerous prior encounters with the criminal justice system that have resulted in multiple felony convictions in both state and federal courts that span much of his adult life.  In addition, he has had multiple instances where he has been found non-compliant with the conditions of supervision.  These factors militate strongly in favor of a significant custodial sentence.

*The Need for the Sentence Imposed to Reflect the Seriousness of the Offense to Promote Respect for the Law, and to Provide Just Punishment*

The attack on the Capitol building was an attack on the rule of law.  As FBI Director Christopher Wray has stated: "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4]  As with the nature and circumstances of the offense, this factor supports a sentence that includes incarceration.  See United States v. Joshua Bustle and Jessica Bustle, 1:21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation.  I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

*The Need for the Sentence to Afford Adequate Deterrence*

Deterrence encompasses two goals:  general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by a particular defendant.  United States v. Russell, 390 U.S. App. D.C. 100, 106 (2010).

*General Deterrence*

The demands of general deterrence weigh in favor of confinement.  The violence at the Capitol on January 6, 2021 was intended to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing in United States v. Paul Hodgkins, 1:21-cr-188-RDM:

---

[4]Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

> [D]emocracy requires the cooperation of the governed.  When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble.  The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification.  It is a damage that will persist in this country for decades.

.        .        .

> [I]t will be harder today than it was [12] months ago for the United States and our diplomats to convince other nations to pursue democracy.  It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation.

See also United States v. Thomas Gallagher, 1:21-CR-0004-CJN, Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society.  Future would-be rioters must be deterred.").

The gravity of these offenses demands deterrence.  The attack on the Capitol was not a protest. It is important to convey to those who might contemplate a similar attack in the future—especially those who intend to improperly influence the democratic process—that their actions will have substantial adverse consequences.  There is possibly no more important factor that this Court must consider.

*Specific Deterrence*

The defendant's significant criminal record, his lack of remorse in the days and weeks thereafter, his belittling of the seriousness of his offenses, and his attempt to profit from them show that he is a risk of committing the same type of offense again.  The defendant's brazenness in publicizing his crimes shows the need for specific deterrence in this case.  It is concerning

enough that he added himself to the mob overwhelming law enforcement.  But, following his entry into the Capitol, he displayed pride for doing so and sought to publicize the events of January 6, 2021, on the cover of his rap album. Furthermore, he downplayed the destruction and violence rather than showing remorse.  His conduct spread the harm further than his actions that day and warrants specific deterrence in and of itself.

> *The Kinds of Sentences Available; the Kinds of Sentence and the Sentencing Range Established for the Applicable Category of Offense Committed by the Applicable Category of Defendant as Set Forth in the U.S. Sentencing Guidelines; and any Pertinent U.S. Sentencing Commission Policy Statement*

By statute, probation, a fine, and a prison term followed by a term of supervised release (for the convictions under 18 U.S.C. § 1752) are the kinds of sentences available to the Court. 18 U.S.C. § 3551(b).  The Court may also issue an order of restitution as an additional sanction. Id.; see id. § 3556.

> *The Need to Avoid Unwarranted Sentencing Disparities Among Defendants With Similar Records Convicted of Similar Conduct*

The sentencing court's duty to consider the need to avoid unwarranted disparities, 18 U.S.C. § 3553(a)(6) is considerably aided by the Guidelines.  "The very purpose of the Guidelines, however, was to eliminate disparity in the sentences of similarly situated defendants."  United States v. Williams, 980 F.2d 1463, 1467 (D.C. Cir. 1992) (citing United States v. Joyner, 924 F.2d 454, 460 (2d Cir.1991)).  "To isolate a single case and conclude that the Sentencing Guidelines inadequately consider sentencing disparity among several defendants is to lose sight of the forest for the trees."  Id.  Thus, it will be the rare case where a sentence within the applicable Guidelines range will amount to an "unwarranted disparity" under § 3553(a)(6).  No such disparity would occur if this Court were to impose a Guidelines sentence

in this case.  As described below, all of the § 3553(a) factors weigh in favor of a Guidelines sentence.

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[5]  Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment.  The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.[6]  See United States v. Anna Morgan-Lloyd, 1:21-cr-00164-RCL, Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth).

The government and the sentencing courts have already begun to make meaningful distinctions between offenders.  Those who engaged in felonious conduct are generally more

---

[5]Attached to this sentencing memorandum, as Exhibit 2, is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.  See, e.g., United States v. Hatley, 1:21-cr-00098-TFH, Tr. 12/16/21 at 3 ("it's a good guideline for the Court to understand the variety of sentences that have been given [referencing the government's sentencing chart]") (statement of Judge Hogan).

[6] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in United States v. Anna Morgan-Lloyd, 1:21-cr-00164-RCL; United States v. Valerie Elaine Ehrke, 1:21-cr-00097-PFF; United States v. Donna Sue Bissey, 1:21-cr-00165-TSC); United States v. Douglas K. Wangler, 1:21-cr-00365(DLF), and United States v. Bruce J. Harrison, 1:21-cr-00365(DLF).  The government is abiding by its agreements in those cases, but has made no such agreement in this case.  Cf. United States v. Rosales-Gonzales, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration.  Those who trespassed, but engaged in less serious aggravating conduct, deserve a sentence more with minor incarceration or home detention.  Moreover, defendants with serious criminal records, even if convicted only of petty offenses, have been sentenced to incarceration.  See United States v. Michael Curzio, 1:21-cr-00041-CJN (Capitol riot defendant convicted of single petty offense sentenced to 6 months in prison); United States v. Karl Dresch, 1:21-cr-00071-ABJ (Capitol riot defendant convicted of single petty offense, and held for six months prior to sentencing, sentenced to time served); United States v. Robert Bauer, 1:21-cr-00049-1-TSC (Capitol riot defendant convicted of single petty offense sentenced to 45 days in jail); United States v. Edward Hemenway, 1:21-cr-00049-2-TSC (same); United States v. Mark Simon, 1:21-cr-00067-ABJ (Capitol riot defendant convicted of single petty offense sentenced to 35 days in jail).

The government submits that a prison term of 21 months—which is the low end of the applicable Guideline term of imprisonment—avoids any unwarranted sentencing disparity. While higher than many Capitol riot misdemeanor sentences, that disparity is not unwarranted in light of the defendant's lengthy and significant criminal history, which includes three prior felony convictions and having been on probation at the time he participated in the riot.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."  United States v. Coppola, 671 F.3d 220, 254 (2d Cir. 2012).  The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may

emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." United States v. Gardellini, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant."  Id. at 1095.

## VI.    Restitution

The government concurs with the recommendations in the draft PSR that no fine should be imposed, due to the defendant's limited income and assets, and that an order to pay $500 in restitution to the Architect of the Capitol be issued.  According to a May 2021 estimate by the Architect of the Capitol, the attack caused approximately $1.5 million worth of damage to the U.S. Capitol building.  See https://www.justice.gov/usao-dc/one-year-jan-6-attack-capitol; https://www.washingtonpost.com/local/legal-issues/capitol-riot-defendants-pay-damages-restitution/2021/06/03/74691812-c3ec-11eb-93f5-ee9558eecf4b_story.html.

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case.  Because a federal court possesses no "inherent authority to order restitution," United States v. Fair, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, United States v. Papagno, 639 F.3d 1093, 1096 (D.C. Cir. 2011).  Two general restitution statutes provide such authority.  First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."  Papagno, 639 F.3d at 1096.  Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214

(codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA.  <u>Papagno</u>, 639 F.3d at 1096.  The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664.  <u>See</u> 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features.  Both require that restitution "be tied to the loss caused by the offense of conviction."  <u>Hughey v. United States</u>, 495 U.S. 411, 418 (1990) (interpreting the VWPA); <u>see</u> <u>United States v. Clark</u>, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under <u>Hughey</u>).[7]  Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[8]  <u>See</u> 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2).  "In view of the purpose of the MVRA and the interpretation of the VWPA's definition of 'victim,' we agree with the Government that it is 'inconceivable that ... Congress somehow meant to exclude the Government as a potential victim under the MVRA when it adopted the definition of 'victim' contained in the VWPA.'"  <u>United States v. Ekanem</u>, 383 F.3d 40, 44 (2d Cir. 2004).

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury.  <u>See</u> <u>Papagno</u>, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b),

---

[7]While both statutes generally limit restitution to losses resulting from conduct that is the basis of the offense of conviction, they also authorize the court to impose restitution under the terms of a plea agreement.  <u>See</u> 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3); <u>see also</u> <u>United States v. Zerba</u>, 983 F.3d 983, 986 (8th Cir. 2020); <u>United States v. Giudice</u>, 2020 WL 220089, at *5 (D.N.J., Jan. 15, 2020).  The defendant in this case did not enter into a plea agreement.

[8]The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA.  <u>See</u> <u>United States v. Emor</u>, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

3663A(b).  Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim.  United States v. Bikundi, 926 F.3d 761, 791 (D.C. Cir. 2019).  The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result.  See Emor, 850 F. Supp. 2d at 202.  The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[9]  United States v. Gushlak, 728 F.3d 184, 196 (2d Cir. 2013); see United States v. Sheffield, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); United States v. James, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); United States v. Burdi, 414 F.3d 216, 221 (1st Cir. 2005) (same); see also Paroline v. United States, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects.  As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49.  18 U.S.C. § 3663(a).  In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial

---

[9]The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review."  Fair, 699 F.3d at 513.  Here, the Court should find that the defendant's conduct in entering the Capitol building as part of a mob caused damage to that building.

resources, and "such other factors as the court deems appropriate."  United States v. Williams, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).  By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" Fair, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[10]

The VWPA also provides that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664."  18 U.S.C. § 3663(d).  Because this case  involves the related criminal conduct of hundreds of defendants, the Court has discretion to:  (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), see id. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses.  Id.  § 3664(h).  That latter approach is appropriate here.

More specifically, the Court should require the defendant to pay $500 in restitution for his convictions on Counts One and Two.  This amount fairly reflects the defendant's role in the offense and the damages resulting from the defendant's conduct.  Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court

---

[10]Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  See 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

where the defendant was not directly and personally involved in damaging property.

Accordingly, such a restitution order avoids sentencing disparity.

### VII.    Conclusion

The government requests that this Court sentence the defendant to a 9-month term of imprisonment for Count One, followed by one year of supervised release; a 12-month prison term for Count Two, followed by one year of supervised release; a six-month prison term for Count Three; and a six-month prison term for Count Four.  The government recommends that the prison terms for Counts One and Two run consecutively to each other, and that the prison terms for Counts Three and Four run concurrently with each other and with the prison term imposed for Counts One and Two.  The supervised release terms must run concurrently with each other. The government is not seeking imposition of any fine.  The Court should order the defendant to pay $500 in restitution.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

by:    /s/*Michael C. Liebman*
Michael C. Liebman
D.C. Bar No. 479562
Assistant United States Attorney
555 4th Street, N.W., room 9106
Washington, D.C. 20530
202-252-7243
202-353-9415 (fax)
michael.liebman@usdoj.gov