<pre>
 1                  BEFORE THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,        .
                                      .  Case Number 21-cr-350
 4             Plaintiff,             .
                                      .
 5       vs.                          .
                                      .
 6   ANTIONNE DE SHAUN BRODNAX,       .  December 19, 2022
                                      .  10:03 a.m.
 7             Defendant.             .
     - - - - - - - - - - - - - - - - -

 8

 9                  TRANSCRIPT OF SENTENCING HEARING
                 BEFORE THE HONORABLE PAUL L. FRIEDMAN
10                   UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   For the United States:      MICHAEL LIEBMAN, AUSA
                                 United States Attorney's Office
14                               601 D Street Northwest
                                 Washington, D.C. 20579
15

16   For the Defendant:         MARY MAGUIRE, AFPD
                                 Federal Public Defender's Office
17                               701 East Broad Street
                                 Suite 3600
18                               Richmond, Virginia 23219

19

20

21   Official Court Reporter:   SARA A. WICK, RPR, CRR
                                 333 Constitution Avenue Northwest
22                               Room 4704-B
                                 Washington, D.C. 20001
23                               202-354-3284

24

     Proceedings recorded by stenotype shorthand.
25   Transcript produced by computer-aided transcription.
</pre>

```
 1                        P R O C E E D I N G S

 2            (All participants present via video conference.)

 3              COURTROOM DEPUTY:  Judge, this is Criminal Action

 4      21-350, United States versus Antionne De Shaun Brodnax.

 5          For the United States, I have Michael Liebman.  For

 6      defendant, I have Mary Maguire.  Our probation officer today

 7      is Sherry Baker, and our court reporter is Sara Wick.  All

 8      parties are present.

 9              THE COURT:  Good morning, everybody.

10          Can you hear me all right, Mr. Brodnax?

11              THE DEFENDANT:  Yes, sir.

12              THE COURT:  All right.  So let me -- we've been

13      waiting a long time for this day, partly because of my trial

14      schedule, partly for other reasons.  And so let me, if I can,

15      sort of provide what I think is an accurate history of the case

16      and where we are, and you all can tell me if anybody disagrees.

17          So on October 22nd, 2021, Mr. Brodnax pleaded guilty to

18      four counts of the Information.  And the first two counts --

19      there was no plea agreement, and he pleaded to the entire

20      Information.  The first two counts were class A misdemeanors,

21      violations of 18 United States Code Section 1752(a)(1),

22      disorderly and disruptive conduct in a restricted building --

23      I'm sorry, entering and remaining in a restricted building, and

24      Count 2, 18 U.S.C. 1752(a)(2), disorderly and disruptive conduct

25      in a restricted building.  Those two counts are class A
```

1   misdemeanors, and the guidelines apply.

2        The other two counts are class B misdemeanors under

3   40 United States Code Section 5104(e), one is (e)(2)(D), the

4   other is (e)(2)(G), disorderly conduct in a Capitol building and

5   parading, demonstrating, or picketing.  Those are class B

6   misdemeanors and are not governed by the guidelines.

7        On July 12th, I had a hearing, and there were four issues.

8   One is whether the offense guidelines section applicable to

9   Count 2 for disorderly and disruptive conduct is governed by

10  2A2.4 of the guidelines or 2B2.3.

11       The second issue was whether a two-level upward adjustment

12  for obstructing justice or impeding the administration of

13  justice applied under 3C1.1.

14       The third was whether the convictions on Counts 1 and 2

15  should be grouped under the guidelines because they're

16  substantially the same harm, and the fourth is whether as a

17  matter of law and policy I should impose concurrent or

18  consecutive sentences.

19       After hearing -- after reading the briefs and hearing

20  argument on July 12, 2022, I concluded that the appropriate

21  guideline is 2B2.3, trespass.

22       The government conceded the third issue, namely agreed that

23  Counts 1 and 2 should be grouped.

24       Obviously, the fourth issue, whether I should apply

25  concurrent or consecutive sentences, is a matter for today's

1   discussion.

2   And with respect to obstruction of justice, the -- on

3   July 12th, we had a fairly long hearing, and I heard -- I read

4   the briefs, and I admitted a number of exhibits in evidence, and

5   I heard testimony from FBI Agent Matthew Heise, H-e-i-s-e, and

6   FBI Special Agent Ken Shappee, S-h-a-p-p-e-e.  There were a

7   number of exhibits, and there was a stipulation of facts

8   relating to that hearing.

9   At the conclusion of the hearing, I said that I would take

10  under advisement the obstruction issue, because I wanted to

11  consider it, look at the guidelines, look at the case law, and

12  review the testimony that I had heard.

13  On August 18, 2022, I issued an order in which I said

14  that -- I reiterated my statement that 2B2.3 is the applicable

15  offense guideline for the reasons stated at the hearing on

16  July 12th.

17  With respect to obstruction, in this order, I had said that

18  I concluded that a two-level upward adjustment for obstructing

19  or impeding the administration of justice under 3C1.1 is

20  appropriate in this case based on the evidence and the

21  arguments.  And I promised that I would provide my reasoning at

22  later date.  That later date is now.

23  So unless anybody has any disagreements or anything they

24  want to add about the history of the case, I will proceed to

25  give you my oral opinion on 3C1.1 just so the record is complete

1    as to why I think that guideline applies in the event I think --

2    you're entitled to my reasoning and in the event there's an

3    appeal of some sort, and there may be, because there was no plea

4    agreement and, therefore, there was no appeal waiver.

5        So does anybody want to say anything before I proceed to

6    give you my reasoning on the obstruction guideline?

7                MS. MAGUIRE:  No, Your Honor.  Thank you.

8                MR. LIEBMAN:  No, Your Honor.  Thank you.

9                THE COURT:  Okay.  The obstruction guideline says --

10   3C1.1 says when calculating a defendant's offense, the Court may

11   increase the offense by two levels if, one, the defendant

12   willfully obstructed or impeded or attempted to obstruct or

13   impede the administration of justice with respect to the

14   investigation, prosecution, or sentencing of the instant offense

15   of conviction and, two, the obstructive conduct related to, A,

16   the defendant's offense of conviction and any relevant conduct

17   or, B, a closely related offense.

18       And the case law says that the government must prove by a

19   preponderance of the evidence that the defendant obstructed

20   justice or attempted to do so and that his conduct was willful.

21       And according to the government, Mr. Brodnax deleted video

22   evidence from his cell phone that recorded his conduct and the

23   conduct of others inside the Capitol on January 6 after he had

24   told the FBI investigators that he had such evidence on his

25   phone and that -- after he had told them that he would provide

1    it at a later date, provide his phone at a later date.

2         The government argued that this is obstruction of the

3    government's investigation of Mr. Brodnax, as well as its

4    investigation of other individuals who participated in the

5    January 6 events.

6         And Mr. Brodnax argued that there is insufficient proof to

7    conclude even on a preponderance that he deleted any videos, and

8    that even assuming that he did delete videos from his cell

9    phone, the evidence deleted was not material, and materiality is

10   a factor under 3C1.1 as to his investigation or the

11   investigation of others' cases, and further, that the government

12   had this information from other sources.

13        So first, what is obstructive conduct?  Comment note 3 to

14   this guideline 3C1.1 says that obstructive conduct can vary

15   widely in nature, degree of planning, and seriousness.  And then

16   it gives a -- in note 4, a -- 4D, a nonexhaustive list of

17   examples, and they're only examples, of the types of conduct to

18   which the adjustment applies.

19        And it says, "Destroying or concealing evidence that is

20   material to an official investigation or judicial proceeding,

21   for example shredding a document or destroying ledgers upon

22   learning that an official investigation has commenced or is

23   about to commence or attempting to do so.  However, if such

24   conduct occurred contemporaneously with arrest, for example

25   attempting to swallow or throw away a controlled substance, it

1    shall not, standing alone, be sufficient to warrant an

2    adjustment for obstruction unless it resulted in a material

3    hindrance to the official investigation or prosecution of the

4    instant offense or the sentencing of the offender."

5         And a case from the D.C. Circuit, *United States v. Bailey*,

6    11 F. App'x, page 7, in 2020, affirmed the district court's

7    finding that the defendant obstructed justice under this --

8    under 3C1.1 with this comment application note in mind when the

9    evidence was that the defendant asked a witness to dispose of

10   his phone.

11        Comment 6 says, "Material evidence, fact, statement, or

12   information means evidence, fact, statement, or information

13   that, if believed, would tend to influence or affect the issue

14   under determination."  And that's application note 6 to U.S.

15   sentencing guideline 3C1.1.

16        So, willfulness and materiality.  To prove willfulness, the

17   government must establish the defendant consciously acted with

18   the purpose of obstructing justice.  That's my decision in

19   *United States v. Makki*, M-a-k-k-i, 47 Fed.Supp.2d 25 in 1999 at

20   page 29.

21        Whether the conduct is -- where the conduct is directly and

22   inherently obstructive, that is, where the defendant engages in

23   behavior that a rational person would expect to obstruct

24   justice, the Court may infer an intent to obstruct justice and

25   not make a specific finding of specific intent, quoting

*United States v. Reeves*, 586 F.2d 20, page 23, D.C. Circuit,
2009.

So in this case, we've got a stipulation of facts from the
parties for purposes of the evidentiary hearing and testimony of
Special Agents Heise and Shappee at the July 12th, 2022,
evidentiary hearing, and I find their testimony credible.  And
based on that, I find that -- I find by a preponderance of the
evidence that Mr. Brodnax willfully obstructed justice in
violation of 3C1.1.

The testimony, and I think it's Agent Heise -- yes.  Agent
Heise said under oath at the hearing -- obviously, the events in
question occurred on January 6, 2021.  The agents contacted
Mr. Brodnax nine days later, on January 15, 2021.  And among the
things that the agents asked Mr. Brodnax was if he had taken any
pictures or videos while he was in there and the reasons why he
left, and he said that he told -- Agent Heise said that
Mr. Brodnax told them that he took numerous pictures and videos
while he was in there.  He claimed he had never been there
before, so he was taking a lot of pictures and videos.  And he
said, according to Agent Heise, that he was using his telephone.

And then Mr. Liebman asked whether or not he had his phone
in his possession while they were interviewing him, and Agent
Heise said yes and that Mr. Brodnax showed the agent one of the
videos that he took inside the Capitol, which was about two
minutes long.  And he showed that video on his cellular

1    telephone, according to Agent Heise.  And the agent described

2    the phone that Mr. Brodnax showed them on January 15, 2021, on

3    which he showed them the video, as a red iPhone.  And there was

4    an exhibit that was admitted in evidence that supports that.

5        The -- and the agent described what he saw in that video

6    and that Agent Heise also said that he asked whether Mr. Brodnax

7    had more than just that one video related to the Capitol riot,

8    and Mr. Brodnax, according to Agent Heise, said yes, he did.

9    And he said he had taken numerous videos and multiple images

10   while inside the Capitol.

11       Agent Heise said that he had asked him if he would give us

12   the phone or consent to turning the phone over to us, and -- or

13   just download the images and videos from the phone.  And

14   according to Agent Heise, Mr. Brodnax did not give consent, did

15   not give the phone, but said that he would e-mail the videos to

16   Agent Heise.  Agent Heise gave him his contact information for

17   the purpose of getting the videos and getting those images

18   e-mailed to him, as Mr. Brodnax said he would do.

19       Subsequently, Agent Heise said that he attempted to follow

20   up with Mr. Brodnax with respect to obtaining the videos, and he

21   said at the hearing that he texted Mr. Brodnax a number of times

22   to remind him that he hadn't gotten the videos.  After a few

23   days, he said he texted him, and he said, "I can't remember

24   exactly when."  And Mr. Heise said that there was at least one

25   text and Mr. Brodnax texted back and said that he would still

get the videos to him.  Agent Heise further testified that
Mr. Brodnax never sent them to him.

So now we fast forward from those events to March 11, 2021,
and that day, Mr. Brodnax was arrested based on criminal
complaint, and the FBI seized his iPhone.  And the iPhone that
they seized looked similar to the iPhone that Agent Heise had
seen and been shown by Mr. Brodnax on January 15.  The iPhone
remained in the government's custody from that day forward.

Subsequently, the government got a search warrant to go
into the contents of the phone, as well as to his social media
accounts, if I'm remembering correctly.  Or maybe -- they
conducted scope reviews of his Twitter and Instagram accounts
and then in August applied for a warrant to examine the contents
of the phone.  And they did that.  They got the warrant to do so
on August the 10th, and then they looked at the phone later.

In other words, they reviewed the contents on October 19th,
2021, according to the stipulation and my notes of the hearing.
And this was, I think, the day before -- day or two before the
plea.

And that leads in part to the government's argument that
this -- the contents of the phone -- I mean the defendant's
argument that the contents of the phone could not have been any
part of an investigation of Mr. Brodnax's case because by then
everybody knew he was about to plead to the four counts in the
information.

1        So in summary, Mr. Brodnax recorded videos while inside the

2   Capitol on his phone that captured his conduct and the conduct

3   of others as they roamed around inside the Capitol and some of

4   them confronted U.S. Capitol Police officers and otherwise

5   engaged in unlawful activity.

6        Then after showing one such video on his phone to the

7   agents and knowing that they were interested in obtaining them

8   and, in fact, promising Mister -- Agent Heise that he would

9   provide those from his phone, he deleted them.  And he -- we

10  know he deleted them between January 15 when Agent Heise

11  interviewed him and March 11 when Mr. Brodnax was arrested and

12  the phone was seized.  Anything that happened between March 11

13  and August or March 11 and October when they actually looked at

14  them is really irrelevant, because from January 15 through

15  March 11, the phone was in Mr. Brodnax's possession, and from

16  March 11 onward, the phone was in the FBI agent's possession.

17  So the videos necessarily were deleted between January 15 and

18  March 11.

19       Now, the investigators were able to recover some videos

20  from Mr. Brodnax's social media accounts, but they were not able

21  to recover all of them apparently, but more importantly, they

22  could not recover any relevant videos from his phone, because

23  the one they had seen wasn't there and the others that they were

24  told from Mr. Brodnax were on there from January 6 were not

25  there.

1        And so I conclude that this conduct amounts to destroying

2   evidence in relation to an official investigation into

3   Mr. Brodnax's unlawful conduct in the Capitol, although it might

4   not have been any longer relevant to the government's

5   investigation if the plea was about to go forward, but it might

6   have been.  There might have been additional charges brought.

7   But certainly, it was relevant to others' unlawful conduct

8   within the Capitol.  And 3C1.1 requires that the obstructive

9   conduct relate either to the defendant's offense of conviction

10  and relevant conduct or to a closely related offense, such as,

11  according to comment application note 1, such as the conduct of

12  a co-defendant.  And there's a lot of cases that talk about

13  that.

14        Mr. Brodnax says the videos deleted, if they were deleted,

15  were not material to an official investigation or judicial

16  proceeding, and he cites note 4D, application note 4D to 3C1.1

17  and 4G with respect to materiality.  He argues that

18  investigators first were able to obtain several videos recorded

19  by Mr. Brodnax from inside the Capitol from his social media

20  account, and they didn't need to search his phone, and they had

21  those before they went into his phone.  So, the defense argues,

22  any videos that were deleted from the phone were not necessary

23  to investigate his case or the case of others because they

24  duplicated or supplemented videos obtained elsewhere.

25        Second, he argues that investigators have been able,

1    through this massive investigation of everything that happened

2    inside the Capitol on January 6, to obtain videos recorded by

3    other individuals other than Mr. Brodnax who were present inside

4    the Capitol, and because there were multiple other sources of

5    the same information that would have been shown by Mr. Brodnax's

6    videos, the defense essentially argues that the deletion of

7    videos from his phone could not have materially affected any

8    government investigation or prosecution.  The defense argues

9    they could not have been material because they did not and could

10   not actually influence the government's investigation of the

11   prosecution of Mr. Brodnax or about anybody else and they

12   weren't necessary.

13        I don't agree.  First, the sentencing guidelines do not

14   define materiality in such a restricted way.  Material evidence,

15   as I said, is material that, if believed, would tend to

16   influence or affect the issue under determination.  That's

17   application note 6.  Evidence is material for purposes of 3C1.1

18   if it could, underscore could, influence or affect an issue

19   before the Court.

20        Several cases on that:  *United States v. Taylor*, 749 F.3d

21   842, Ninth Circuit, 2014; *United States v. Lincecum*, 220 F.3d

22   77, Seventh Circuit, 2000.

23        The videos recorded by Mr. Brodnax while inside the

24   Capitol, all of which were deleted from his phone, captured his

25   and others' unlawful activities on January 6 and, therefore,

could have been used to build a case against those who
participated in the Capitol events of January 6.  And we don't
know.  It's pure speculation whether the same or similar or
duplicative information was on his Twitter account and Instagram
account or on other people's cameras.  We don't know what they
would have shown about the conduct of others.

Secondly, 3C1.1 is a guideline that talks about obstructing
justice -- obstructing an investigation or obstructing or
impeding the administration of justice or attempting to do so.
And an attempt is sufficient for the two-level enhancement.
Loads of cases on that, as well as the language of the
guideline.  For example, *United States v. Brown*, 560 F.3d 754 at
772, Eighth Circuit rejecting a defendant's argument that the
obstruction enhancement did not apply because the defendant did
not actually succeed.

So it doesn't matter that the government obtained some
videos recorded by Mr. Brodnax from his Twitter and Instagram
accounts, and it doesn't matter that the government obtained
videos recorded by others that may have captured the same events
at the Capitol.

The evidence shows by a preponderance or more that
Mr. Brodnax deleted videos between January 15, 2021, and March
11, 2021, months before the government obtained search warrants
for his social media accounts and months before they got his
phone.

1      Regardless of whether the government obtained evidence from

2   other sources, he destroyed evidence, material evidence during

3   the pendency of an ongoing investigation that could have

4   affected his case and certainly could have affected the cases of

5   others.  What he deleted was material under 3C1.1 because they

6   could have influenced issues before the Court, before me or

7   before my colleagues, including whether and when certain

8   individuals were present inside the Capitol, whether they

9   engaged in any unlawful acts, whether they engaged in violence

10  against persons or properties.

11      And I also conclude that Mr. Brodnax's conduct was willful.

12  As I've already said, the Court may infer an intent to obstruct

13  justice where the defendant engages in behavior that a rational

14  person would expect to obstruct justice, behavior that can be

15  inferred from conduct because we can't read a person's mind, and

16  in considering whether a defendant acted with an obstructive

17  intent.  The cases say that a Court may properly draw all

18  reasonable inferences both from the words used, from the actions

19  taken, from the relevant circumstances.  And the *Reeves* case,

20  I've already mentioned.  *United States v. Sisti*, 91 F.3d 305,

21  Second Circuit, 1996, and many others.

22      So given the timeline of events, I find that Mr. Brodnax

23  willfully destroyed video evidence on his iPhone knowing that

24  the government actively sought to obtain that evidence and that

25  it was material.  He knew that his actions in the Capitol were

1    being investigated.  He knew that as late as January 15, 2021 --

2    or as early as January 15, 2021, possibly earlier, he knew that

3    the actions of others were being investigated.  He knew from

4    what Agent Heise told him that, having seen one video, the

5    government wanted to obtain other videos on his phone that he

6    had taken while inside the Capitol.  And the agents asked for

7    the videos, and he promised to send them, and he nevertheless

8    deleted them some time between -- from his phone some time

9    between January 15 and March -- the date in March 2021.

10        And under the cases, this is a willful act to destroy

11   evidence that was material under 3C1.1.  *Makki*; *U.S. v. DeLeon*,

12   437 F.Supp.3d 955; *United States v. Martin*, 369 F.3d 1046,

13   Eighth Circuit; and other cases that I've cited and we've all

14   read.

15        So that's all I have to say on this issue unless somebody

16   wants to say anything further about it or --

17             MR. LIEBMAN:  No, thank you, Your Honor.

18             MS. MAGUIRE:  Nothing further.

19             THE COURT:  Okay.  All right.  So if we're ready, if

20   everybody's ready, we can move on to the sentencing itself, and

21   in that regard, I do want to say that I have read everything.

22   I've read the presentence investigation report.  I've reread the

23   Statement of Offense that had been submitted.  I've read the

24   recent Pretrial Services report.  And I've read the sentencing

25   memos submitted by the government and the defense, which I

1    believe are government's docket 41, defendant's docket 43,

2    government's docket 56, and defendant's -- 56 from the

3    government -- 66 from the government, 67 from the defense and 68

4    from the defense.  And I think those are all the filings that

5    have been made.

6        And under the guidelines, I'm first supposed to announce my

7    guidelines calculations, but I think before we do that, we

8    should go to the receipts and acknowledgments that both sides

9    have filed, and I think it also relates to defense 67 and 68.

10       So let me start with the government because I know the

11   defense still have some issues that need resolution.

12       On January 6, 2022, Mr. Liebman filed a receipt and

13   acknowledgment that said there are material factual inaccuracies

14   in the presentence investigation report and appended to them a

15   letter of the same date that he had sent to the probation

16   officer, Carmen Newton, and she has since left the Probation

17   Office, but Ms. Baker is with us today.  I still keep wanting to

18   call you by your maiden name, Sherry, but Ms. Baker is with us

19   today.  And there's a letter dated January 6, 2022, from the

20   government.

21       So let me ask Mr. Liebman, are there still material factual

22   inaccuracies that I need to address, or have they been

23   adequately dealt with by Probation at this point?

24           MR. LIEBMAN:  No material inaccuracies, Your Honor.

25   They've been dealt with.

1   There is -- there are a couple of mistakes in the

2   sentencing recommendation of the Probation Office.  At some

3   point, if we can talk about that, but nothing about the

4   probation report itself.

5          THE COURT:  As long as we're there, why don't you

6   mention it, because I think you and Ms. Maguire may actually

7   agree on at least one of them.

8          MR. LIEBMAN:  Very well.

9          THE COURT:  This is docket 63 we're talking about?

10          MR. LIEBMAN:  Yes, Your Honor.

11   So the recommendation states on page 3 that the defendant

12   has been detained and is ineligible for voluntary surrender.

13   That's inaccurate.  He's not detained, obviously.  For what it's

14   worth, if the Court does order confinement or incarceration, the

15   government is not going to be opposing voluntary surrender.

16   And also, on the first page, there's a -- in the table

17   there, it says that restitution is not applicable.  As I set out

18   in our sentencing memo, there is an applicable restitution

19   statute here, and the government is requesting restitution.

20          THE COURT:  Yes.  Well, with respect to your -- and

21   Ms. Maguire raised the first point you made, and I talked to

22   Ms. Kraemer-Soares this morning, actually, and she --

23   Ms. Hernandez started this -- not Hernandez.  The prior

24   probation officer started the presentence investigation report

25   and, I guess, did the draft, and her supervisor,

1   Ms. Kraemer-Soares, completed it.  And she agrees with you and

2   Ms. Maguire that the point about voluntary surrender and

3   detention status on page 3 is wrong.  If this material goes to

4   the Bureau of Prisons or wherever, we can ask for a revised

5   version of this.

6       I didn't talk to her about the first part, but I do think

7   the guidelines permit restitution.  And in the cases where there

8   are pleas pursuant to a plea agreement, most of the defendants

9   have agreed to $500 restitution for misdemeanors.  So I would

10  think that if I -- that that would be an appropriate amount in

11  this case, too.  But obviously, Ms. Maguire may have some views

12  on that.

13      So if you're done for the moment, Mr. Liebman, I might turn

14  to Ms. Maguire.  The receipt and acknowledgment filed by the

15  defense, by Ms. Maguire and Mr. Brodnax, in January of 2022,

16  January 4, I believe, lists a number of things that she says are

17  incorrect, and some of them are also reiterated in her most

18  recent filing.

19      So, Ms. Maguire, are there matters that I should resolve in

20  the presentence investigation report?

21          MS. MAGUIRE:  Yes, Your Honor.  Thank you.

22      I do think that there are four matters that still need to

23  be updated in the presentence report that remain unresolved, and

24  I do think that under Federal Rule of Criminal Procedure 32 and

25  U.S. Guideline 6A1.3, they are important factors for sentencing.

1        The first one is in paragraph 1 of the presentence report.

2   As the Court might recall, when we were before the Court in

3   July, I recognized that there was a typographical error in the

4   Statement of Offense in this case.  I then filed an amended

5   Statement of Offense, which is ECF 60, which makes clear that

6   Mr. Brodnax's departure from the Capitol, the times in the

7   Statement of Offense, and this is in paragraph 20, should be

8   listed as 3:01 and 3:06 instead of 4:01 and 4:06.

9        And this is material and important to this sentencing, Your

10  Honor, because it shows the amount of time that Mr. Brodnax was

11  inside the building.

12          THE COURT:  I agree with that, and you're right.  And

13  I will ask Ms. Baker if she would make sure that that's

14  corrected, and we will have an amended presentence report and

15  also an amended recommendation, docket 63, pursuant to the

16  discussion we previously had.  So we will take care of paragraph

17  20.

18        You also mentioned paragraph 1.  Did I hear you correctly,

19  Ms. Maguire?

20          MS. MAGUIRE:  No, I'm sorry.  I did not say paragraph

21  1.

22          THE COURT:  Oh, okay.  So paragraph 20, there will be

23  an amended report which amends 20.

24          MS. MAGUIRE:  The next updated information would come

25  in paragraph number 61, because since the filing of the

1      presentence report, Ms. Yearwood has left her employment and is

2      currently not working.  So therefore, Mr. Brodnax is the sole

3      source of income for the household that includes Ms. Yearwood

4      and her three daughters.  And that happened just in the interim

5      period between when the final presentence report was filed and

6      today's sentencing hearing.

7          So again, I think that that is a fact relevant to

8      sentencing and would request that that change be made.

9              THE COURT:  Well, let me turn to Ms. Baker on that

10     one.  My -- unless -- well, let me put it this way:  I can

11     consider it, whether paragraph 61 is amended or not, and the

12     question is whether or not our Probation Office or Pretrial in

13     Georgia have sufficient information for our Probation Office to

14     amend paragraph 61 without further investigation, which at this

15     point I don't want to send them out to do.

16         I don't know, Ms. Baker, if you know the answer to that or

17     if you've seen the most recent presentence report which was

18     filed on December 18.  And I'm not sure whether it's in there or

19     not.  But the Probation Office in the Northern District of

20     Georgia is supervising him pretrial and would also be

21     supervising him post-sentence.

22         So can that paragraph be changed if your counterpart in

23     Georgia confirms the accuracy of what Ms. Maguire just said?

24             PROBATION OFFICER:  Yes, it can, Your Honor, and just

25     as you alluded to, once we've received some kind of confirmation

1    indeed that Ms. Yearwood is unemployed.

2            THE COURT:  So as long as we're going to have to amend

3    it for paragraph 20 anyway, if probation in Georgia can confirm

4    that without everybody having to run to her former employer or

5    go re-interview her, and it sounds like they can, that paragraph

6    should be amended as well.

7            PROBATION OFFICER:  Correct, Your Honor.

8            THE COURT:  Thank you.

9        Ms. Maguire?

10           MS. MAGUIRE:  Yes, Your Honor.  I would just say on

11   that point, we did append Exhibit 1 to our supplemental position

12   on sentencing, which is a letter from Ms. Yearwood that states

13   that fact.  So I don't know if that would be helpful to the

14   Probation Office in confirming that factual change, but she did

15   write a letter to that effect, which is appended to ECF 67 as

16   Exhibit 1.

17           THE COURT:  Ms. Baker will take a look at that, too,

18   but I think in terms of -- from her official standpoint, having

19   it confirmed by Probation in Georgia is also important.

20           MS. MAGUIRE:  And then, Your Honor, we just have two

21   other minor corrections.  And again, this is just to make the

22   report accurate.

23       Paragraph 62, I would simply note that Mr. Brodnax's

24   daughter is now ten years old and not nine years old, and she's

25   in the fifth grade instead of the fourth grade.  Again, I'm not

1    sure that that impacts sentencing one way or the other, but I

2    was just trying to make sure that the report, you know, was

3    accurate in that respect.

4            THE COURT:  Okay.

5            MS. MAGUIRE:  And then the last change, Your Honor,

6    comes -- my requested change comes at paragraph 76 of the

7    report.  Again, this is just after the final presentence report

8    was disclosed.

9        Mr. Brodnax has left his employment with Universal Pure in

10   Villa Rica, Georgia, and has been hired by Printpack in Villa

11   Rica, Georgia.  And he just received a raise and now earns

12   $22.50 an hour.  That company makes food wrappers.  And again, I

13   appended to my supplemental pleading, ECF 67, the most recent

14   comments from his supervisor concerning his employment

15   performance, which is outstanding.  And then I also just filed

16   even more recently in ECF 68, Your Honor, proof that he has

17   received a raise at his job.

18       And I believe that that is all reflected in the most recent

19   Pretrial Services report that we just were disclosed on PACER

20   last night.

21           THE COURT:  Again, it seems to me that as long as

22   we're going to have a revised report anyway, anything that has

23   been confirmed by Probation in Georgia Ms. Baker and

24   Ms. Kraemer-Soares can make sure is changed here.  I just don't

25   want anybody having to go do additional work sort of after the

sentencing.  But since they're doing a revised report on really

important stuff anyway and a revised recommendation and since I

think you're right that docket 69, Pretrial Services, which is

all based on what Probation in Georgia said, I think a phone

call between Ms. Baker and her counterpart in Georgia,

Probation, can lead to a revised report reflecting what you've

just said, since we're going to do a revised report anyway.

MS. MAGUIRE:  Thank you, Your Honor.

Then the only last comment I would have is when the Court

was listing the ECF numbers of everything you've read in

preparation of today, I believe -- and I may just have missed

it.  But our original sentencing memorandum was ECF 36.

THE COURT:  Yes, yes.  Either I didn't say it, or you

missed it.  I think I may not have said it.

Okay.  So with Mr. Liebman's comments about the receipt and

acknowledgment and Ms. Maguire's comments about the recent and

acknowledgment and my agreement and Ms. Baker's agreement that

those amendments will be made, shall I go ahead and announce my

guidelines calculations?

And again, for Mr. Brodnax's benefit, although I'm sure

Ms. Maguire has explained this many, many, many times, the

federal sentencing guidelines are advisory, and I don't have to

follow them.  But the Supreme Court and our Court of Appeals

have said that the first step in any sentencing is to announce

the guideline calculations, because if I am wrong, it's best to

1    have counsel correct me before we move on to consider all the
2    discretionary factors that I'm going to consider.  So that's
3    what I'm going to do.

4        So as I said at the -- earlier, Mr. Brodnax has pled guilty
5    to all four counts of the Information in this case.  There is no
6    plea agreement.  There's a plea, an agreement that he did these
7    things and a Statement of Facts that support them, and I've
8    already found that the Statement of Facts and what was said at
9    the plea proceeding were sufficient to make out the elements of
10   each of these four counts.

11       So Count 1 and Count 2 are class A misdemeanors, and they
12   are governed by the guidelines.  One is entering and remaining
13   in a restricted building or grounds, 18 United States Code
14   Section 1752(a)(1), and the other is disorderly and disruptive
15   conduct in a restricted building or grounds in violation of
16   Title 18 United States Code Section 1752(a).

17       And there was no dispute about one of them as to which
18   guideline applied, but I have ruled that the other one is also
19   governed by 2B2.3.  So both are governed by 2B2.3 of the
20   guidelines, which is trespass.

21       The base offense level under 2B2.3 is a level 4.  The
22   presentence report suggests and I have independently decided and
23   agree that there is a two-level upward adjustment under
24   2B2.3(b)(1)(A), which says that if the trespass occurred at a
25   restricted building or grounds, two levels are added.  And the

1    Capitol and its grounds qualify under the relevant statute and

2    under this guideline.  And for the reasons I've said before,

3    I've also concluded that 3C1.1, obstruction, is implicated here.

4    So that's base offense level 4, specific offense characteristic

5    add 2, and obstruction add 2.  That's 8.

6        Because Mr. Brodnax accepted responsibility and pled

7    guilty, I will reduce that and the guideline says I shall reduce

8    that under 3E1.1 for acceptance of responsibility.  That puts

9    him at an offense level 6.

10        And pursuant to guideline 3D1.2(b), Counts 1 and 2 are

11    grouped because the guideline says when counts involve the same

12    victim and two or more acts or transactions connected by a

13    common criminal objective or constituting a part of a common

14    scheme or plan, they shall be grouped.  And that is certainly

15    the case here.  So that gives us an offense level of 6 for

16    Counts 1 and 2 taken together.

17        Then we have to calculate criminal history.  Mr. Brodnax

18    has a lot.  At least under the guidelines, they add up to a lot.

19    Starting at the age of 18, he's got possession of a controlled

20    substance, but that does not affect the guidelines.  He's got

21    also at the age of 18 robbery in the Circuit Court of Henrico

22    County, Virginia.  He pled guilty and got sentenced under the

23    Youth Offender Program, five years suspended, and that results

24    in no criminal history points under the guidelines, I guess

25    because of his age.

1    At the age of 22, he's convicted in federal court in
2    Greenbelt, Maryland, possession of a firearm having been
3    convicted of a felony in the past.  The felony in the past was
4    the robbery I just mentioned, but because it's a possession of a
5    firearm by a prior convicted felon, it's an 18 U.S.C. 922(g)
6    conviction, which yields a new sentence to 34 months and three
7    years' supervised release.

8    The release was subsequently revoked, and he was sentenced
9    to another 24 months, according to the presentence report.  But
10    under the guidelines, he gets three criminal history points for
11    that.

12    There's another drug conviction in Henrico County, and
13    noted in paragraph 47 of the presentence report, no criminal
14    history reports.

15    But then in 2016, when he was 33, he pled guilty to
16    manufacture of a controlled substance and drugs in Henrico
17    County, and that's discussed in paragraph 48, and another plea
18    on the same day but different criminal case in Henrico County,
19    it looks like, possession of drugs, and pled guilty to that,
20    pled guilty to the ones discussed in paragraph 48.

21    He got -- on the paragraph 48 offenses, he got -- he pled
22    guilty, five years' imprisonment, all but one year suspended,
23    followed by seven years' probation, and two criminal history
24    points.

25    And then for the other case in Henrico County discussed in

paragraph 49 when he was 33 years old, in 2016, he had two years, but all of it was suspended with seven years' probation. And he gets two criminal history points for that.

So that leads to 3 plus 2 plus 2 is seven criminal history points.

But under the guidelines, by committing the instant offense on January 6, 2021, he was still under a criminal justice sentence for the Henrico County offense of -- or he was still on probation, and therefore, two criminal history points are added. That gives him a total of nine criminal history points, and with nine criminal history points, that puts him in criminal history category IV.

And under the federal sentencing guidelines, which again are advisory, with an offense level of 6 and criminal history category IV, the guideline range, the advisory guideline range is six to 12 months.

And, you know, his past has caught up with him.  If he had no priors and was an offense level 6, the guidelines would say zero to six.  If he had only three criminal history criminal points instead of nine, the guidelines would say one month to seven months.  But as I read the guidelines, at an offense level 6, criminal history category IV, it's six to 12 months.

Does either counsel disagree with my guideline calculations?

MR. LIEBMAN:  No, Your Honor.

1          MS. MAGUIRE:  Your Honor, we do not disagree with your

2    guidelines calculations.  We would simply note that they do fall

3    within zone B of the guidelines.

4          THE COURT:  Correct.  So -- and again, the guidelines

5    are advisory.

6      So that having been said, I think we are now ready for the

7    allocution.  And the guidelines, as I said, are advisory.  We

8    all know that.  And now I have to decide in my discretion what

9    is the most appropriate sentence for Mr. Brodnax in all of the

10   circumstances considering the factors under 3553.

11     And so I don't know whether counsel have agreed upon who is

12   going to speak first, but I'm ready to hear from you.

13         MR. LIEBMAN:  We hadn't discussed it, Your Honor, but

14   I'm happy to go first, if that's all right with defense counsel.

15         MS. MAGUIRE:  That's fine.  Thank you.

16         THE COURT:  Yes.  And then Ms. Maguire can not only

17   present what she was going to say anyway but also respond to

18   what the government says this morning.

19     All right, Mr. Liebman.

20         MR. LIEBMAN:  Thank you, Your Honor.

21     As the Court knows from reviewing the government's filings,

22   we are asking for a overall sentence of 18 months in prison.  I

23   would emphasize that this is still a guideline-compliant

24   sentence.  Even though there's no plea agreement here, the

25   government could ask for the statutory maximum.  It also is a

1    lower sentence than we initially advocated for in our initial

2    sentencing memorandum, because we are recognizing the Court's

3    findings about the guideline range, as well as the grouping

4    issue, which the government had a change in position, although

5    it was office-wide, earlier this year.

6         I should also emphasize, 18 months is not just a

7    guideline-compliant sentence recommendation.  It's actually not

8    even the highest guideline-compliant recommendation we could

9    make.

10        So with that said, Your Honor, I do have a short PowerPoint

11   I would like to share.  I know the Court did have a hearing in

12   July.  Some of this won't be new, but a lot of it is, and if I

13   may proceed.

14             THE COURT:  Yes, sir.

15             MR. LIEBMAN:  Thank you.

16             MS. MAGUIRE:  Your Honor, I would just note that if

17   part of this is the montage that Mr. Liebman had presented to me

18   on Thursday, I will just note that certainly the Court can

19   consider whatever is presented, but that none of the montage

20   information that I reviewed reflects any behavior by

21   Mr. Brodnax.  I'm not sure of its relevancy.

22             MR. LIEBMAN:  It's relevant to the fact that this

23   happened in the context of a riot involving thousands of people,

24   the defendant's offenses.  That's why I would like to show not a

25   lot of it, but some of it.

1      All right.  I'm going to try to share my screen here.

2   Hopefully, the Court can see my screen.

3      THE COURT:  I can.

4      MR. LIEBMAN:  Your Honor, just to put things in

5   perspective as to time, this first image is at 12:57 p.m.  It's

6   looking out from the west side of the Capitol on a security

7   camera heading -- looking northwest.  That's the Peace Circle

8   Monument right there in the middle of the frame.  This is about

9   five minutes after the initial breach of the fence line, which

10   is right in front of the Peace Circle.  That happened about

11   12:53 p.m.

12      So this is at 2:13 p.m.  This is actually -- we are pretty

13   confident this is the actual initial breach of the building.  By

14   happenstance, it is actually the same doorway the defendant

15   himself entered the Capitol through, and I will get to that

16   slide in a minute, not too much afterwards.  But this is at

17   2:13 p.m.  It's the Senate Wing doorway.

18      And just in terms of understanding what happens shortly

19   thereafter, it was three minutes after the initial breach that

20   the Senate recessed its proceedings and didn't resume until

21   8:06 p.m., and then 2:19 p.m., the House recessed, not to resume

22   until the same time.

23      So this slide shows where -- beneath that blue arrow where

24   that Senate Wing doorway is.  And here is what it looked like on

25   the outside from security cameras at 2:23 p.m.  By this time,

it's 10 minutes after that initial breach, and numerous rioters are outside the Senate Wing doorway.

The reason I picked 2:23 p.m. is to show Your Honor what it looked like on the outside, is because at the same moment the defendant, under the red arrow here, is actually entering the building through the Senate Wing doorway, so about ten minutes after the initial breach of the building. This floor map shows where the defendant entered through. The blue arrow is the Senate Wing doorway.

And then he proceeded to head toward the House side heading south. At some point he went up the stairs, because this is the second floor. We're not sure exactly where and when it happened, but he goes through the Rotunda and then through Statuary Hall, heading towards the House Chamber.

And here at 2:28 p.m., he is entering the Statutory Hall area. That's him under the blue arrow right there in the background five minutes after he made entry.

And this is a video, hopefully I can get it to play, taken by someone who posted it on social media.

(Video played.)

MR. LIEBMAN:  That's the defendant here in the lower left. I just put this in here, Your Honor, so you understand what was happening, what other people were doing, other rioters were doing contemporaneously while he was there. We can't hear his voice. He might not be saying anything. But he is with

1    other rioters, including one very vocal and vulgar rioter who is

2    threatening the Speaker of the House.  And that's around the

3    same time at 2:28 p.m.

4        And here, this is a security video from seven minutes

5    later.  The crowd surges through past the police line to get

6    closer to the doors to the House Chamber.  The defendant is

7    actually behind that yellow flag in the lower left of the group,

8    of the crowd.  And if I play here, you will see him move forward

9    past the police line with other rioters at 2:35 p.m., if I can

10   get it to play.  There's no audio for this one.

11       (Video played.)

12       MR. LIEBMAN:  There he is just behind the flag there

13   with the sunglasses and the tattoo'ed head, moving forward now

14   and out of the frame there toward the bottom.

15       So this is another social media video posted with audio

16   after the crowd has surged past that point, Your Honor, to the

17   Senate Wing door.  And you will hear on this audio the rioters

18   are chanting "break it down."

19       (Video playing.)

20       MR. LIEBMAN:  He's in the lower right holding the

21   phone up.  I showed more of that video at the hearing in July.

22       And here is what was going on on the other side of that

23   doorway at the same time, Your Honor.  We have security officers

24   from the Capitol Police wielding firearms ready to use them if

25   the crowd should break through.

1      And then at 2:49 p.m., there is the defendant walking back

2  through the Statuary Hall -- or toward the Statuary Hall, I

3  should say.  It's now cloudy because the police had to deploy a

4  chemical irritant.

5      And then at 3:06 p.m., the defendant makes his way out.

6  That's the back of his head in the red hoodie heading out

7  through the East Rotunda doorway onto the Capitol grounds.

8      And then once outside the Capitol grounds, he posts

9  pridefully on a Capitol Police SWAT vehicle for some pictures.

10     And in fact, I think I should point out, the defendant used

11  a version of this moment, a different picture from a different

12  post moment to publish a rap album, Your Honor, where he has two

13  tracks that -- I don't want to give it too much attention,

14  obviously.  So I'm not going to show the cover.  But it's

15  actually an image of him sitting on the Capitol Police vehicle.

16  He has two tracks.  It's called "The Capitol," and he has two

17  tracks that are actually pretty relevant where he kind of boasts

18  about what he did.

19     I will play one of them now.  They're both short.

20     (Audio played.)

21     MR. LIEBMAN:  So the defendant's alias is Bugzie the

22  Don, and he is talking about, whoever that person might have

23  been, he was walking through that place like he was the Don.

24     This was -- by the way, this album is still available

25  today.  I went online to see if I could find it.  It's still

1    there.  It was posted -- it was released on March 4, 2021, a

2    week before he was arrested and about several weeks after he

3    told the FBI he would send them videos.

4         There's one more track I would like the Court to hear.

5         (Audio played.)

6              MR. LIEBMAN:  I hope the Court could make out that

7    audio.  The defendant was asked by some interviewer why he was

8    in the Capitol, and he said because he felt like it, and then he

9    laughs.

10        I know the defense is asking for a probationary sentence,

11   Your Honor.  We think that would be highly inappropriate.  As

12   the Court just recounted, the defendant has -- not only was he

13   on probation for a felony conviction when he entered the Capitol

14   on that day, he has a poor record of institutional compliance

15   with probation from a previous conviction.

16        And I think as the Court is aware, he also got arrested,

17   not for a serious offense but still significant, while this case

18   was pending.  And those charges have yet to be resolved.

19        For all those reasons, Your Honor, we are asking for a

20   guideline-compliant sentence, a sentence of 12 months for each

21   of the two -- first two counts, the class A misdemeanors, to run

22   concurrently with each other consistent with the grouping rules,

23   but we would ask that the petty offenses, which have a max of

24   six months, that the Court impose the maximum on those counts as

25   well and have them run concurrent with each other but

1      consecutive to the class A misdemeanor counts, Your Honor.

2           That's all I have.

3           THE COURT:  Thank you.

4      So let me suggest we take a five-minute break.

5      Is that enough, Ms. Maguire?

6           MS. MAGUIRE:  That's fine, Your Honor.

7           THE COURT:  And is that enough for our court reporter,

8      if we take five minutes and come back for the rest of this

9      hearing?

10          COURT REPORTER:  Yes, Your Honor.  Thank you.

11          THE COURT:  Okay.  Five minutes, and we will be back.

12          (Recess taken from 11:15 a.m. to 11:21 a.m.)

13          THE COURT:  If we are ready and everybody is ready, I

14     will hear from Ms. Maguire.

15          MS. MAGUIRE:  I first want to start out addressing the

16     legal issue here about concurrent and consecutive sentences,

17     because Mr. Liebman repeated several times that he was

18     requesting a guideline-compliant sentence, and I actually think

19     that that's a misstatement of the law.  So I would like the

20     Court to consider two things.

21          The guideline section that talks about the imposition of

22     multiple sentences is found at 5G1.2, and that provides guidance

23     to the Court in how to impose a sentence where there are

24     multiple counts of conviction.  And what that application note

25     explains is that accept as otherwise required by Subsection (e)

 1   or any other law, the total punishment is to be imposed on each

 2   count, and the sentences on all counts are to be imposed to run

 3   concurrently to the extent allowed by the statutory maximum

 4   sentence of imprisonment for each count of conviction.  This

 5   section applies to multiple counts of conviction, A, contained

 6   in the same indictment or information or, B, contained in

 7   different indictments or information for which sentences are to

 8   be imposed at the same time or in a consolidated proceeding.

 9        It goes on to explain that usually at least one of the

10   counts will have a statutory maximum adequate to permit

11   imposition of the total punishment as a sentence on that count.

12   The sentence on each of the other counts will then be set at the

13   lesser of the total punishment and the applicable statutory

14   maximums --

15             THE COURT:  I'm sorry.  Where are you reading from?

16             MS. MAGUIRE:  I'm looking at 5G1.2 of the guidelines,

17   Your Honor.

18             THE COURT:  5D1.2?

19             MS. MAGUIRE:  G, as in girl.

20             THE COURT:  5G1.2, all right.

21             MS. MAGUIRE:  I had already gotten to Subsection (d)

22   of that section, Your Honor.  I'm happy to pause.  I know this

23   is a little awkward doing it this way.  If the Court finds it

24   easier just to read it to yourself, that's fine as well.

25             THE COURT:  Where were you reading from most recently?

1          MS. MAGUIRE:  So most recently, I was at 5G1.2, and I

2     had just finished reading Subsection (c), which says if the

3     sentence imposed on the count carrying the highest statutory

4     maximum is adequate to achieve the total punishment, then the

5     sentences on all counts shall run concurrently except to the

6     extent as required by law.

7          And then, of course, it does allow in Subsection (d) that

8     if the sentence imposed on the count carrying the highest

9     statutory maximum is less than the total punishment, then the

10    sentence imposed on one or more of the other counts shall run

11    consecutively, but only to the extent necessary to produce a

12    combined sentence equal to the total punishment.  In all other

13    respects, sentences on all counts shall run concurrently except

14    to the extent otherwise required by law.

15         In addition, Your Honor, I would bring the Court's

16    attention to 18 United States Code Section 3584, Subsection (a),

17    which also states that multiple terms of imprisonment imposed at

18    the same time run concurrently unless the Court orders or the

19    statute mandates that the terms are to run consecutively.

20         And in addition to 18 U.S.C. 3584(a), we also have the

21    Supreme Court's decision in *Sester v. United States,* found at

22    566 U.S. 231, which discusses, of course, the Court's discretion

23    here and how there is a presumption that these sections and

24    sentences are to run concurrently.

25         And so in terms of a compliance with the law and a

1    compliance with the guidelines, I believe that that should

2    result in fully concurrent sentences on all four counts of

3    conviction for Mr. Brodnax.

4        We do agree that the guidelines are properly calculated at

5    six to 12 months.  That falls within zone B of the guideline,

6    which allows this Court to impose a sentence of probation with a

7    special condition of home confinement, because under the

8    guidelines --

9        THE COURT:  Before you get to that, if the guidelines

10   say six to 12 months, largely because of his prior history

11   putting him in criminal history category IV, if I wanted to

12   apply a guideline sentence, how could I get above six months if

13   you're right on what you just said about 5G1.2?

14       I mean, I would have to say there have to be some

15   consecutiveness here, wouldn't I, to apply a guideline sentence,

16   if that's what I wanted to do?

17       MS. MAGUIRE:  No, because the statutory maximum, Your

18   Honor, on Counts 1 and 2 is 12 months.

19       THE COURT:  Oh, I see.  So you would argue -- I don't

20   want to put words in your mouth.  We all know that the

21   guidelines can never trump the statute.  So a judge can never go

22   above the statutory maximum, no matter what the guidelines say.

23   And so you would argue -- I guess you're arguing that since the

24   maximum is six months for each of these, that reading that fact

25   together with the guidelines you just went through under 5G1.2,

1   are you saying I couldn't impose consecutive sentences to get

2   above six months or that I shouldn't or that the presumption is

3   that I shouldn't?

4          MS. MAGUIRE:  I think the presumption is that you

5   should not, Your Honor.  But I would say if the guideline range

6   is six to 12 months, the statutory maximum on Counts 1 and 2 is

7   12 months.  So I believe that what the guidelines call for is

8   that even if the Court wanted to impose --

9          THE COURT:  Oh, I see.

10         MS. MAGUIRE:  -- 12 months, that that should then on

11  Counts 2, 3, and 4, you could impose 12 months, which is the

12  maximum, and six months on all the other -- the two petty

13  offenses, if the Court were so inclined, but that all of those

14  should be imposed concurrently so that the total sentence does

15  not exceed a statutory maximum of 12 months.

16         THE COURT:  Okay.  So basically what you're saying,

17  although this is not by any means what you're advocating, is

18  that if I wanted to impose a guideline sentence, I couldn't go

19  above 12 months, I couldn't do what the government says of 18,

20  or at the very least it would be a very strong presumption

21  against doing it, reading the guidelines and the statutes that

22  you just cited and the Supreme Court case.  At the very least,

23  there would be a very strong presumption about not going above

24  12.

25         MS. MAGUIRE:  That is correct, Your Honor.

1          THE COURT:  Okay.  Got it.

2          MS. MAGUIRE:  Obviously, as the Court has already

3     noted, that is not what we are advocating, because Mr. Brodnax's

4     guideline range of six to 12 months on the sentencing table

5     falls into zone B of the guidelines, and what the guidelines say

6     about sentences that fall within zone B of the guidelines is

7     that those sentences can be satisfied by substituting -- and

8     this is under 5C1.1 of the guidelines, and 5C1.1, Subsection

9     (c), says if the applicable guideline range is in zone B of the

10    sentencing table, the minimum term may be satisfied by a

11    sentence of imprisonment, a sentence of imprisonment that

12    includes a term of supervised release with a condition that

13    substitutes community confinement or home detention according to

14    the schedule in Subsection (e), provided that at least one month

15    is satisfied by imprisonment, or a sentence of probation that

16    includes a condition or combination of conditions that

17    substitute intermittent confinement, community confinement, or

18    home detention for imprisonment according to the schedule in

19    Subsection (e).

20        And Subsection (e) of guideline 5C1.1 says that one day of

21    intermittent confinement in prison or jail for one day of

22    imprisonment, meaning home detention, is equivalent -- I'm

23    sorry.  Under 5C1.1, Subsection (e)(3), one day of home

24    detention can satisfy or substitute for one day of imprisonment.

25        And so just so we are clear about what the guidelines say

1    about the authority this Court has, because Mr. Brodnax's

2    sentence under the guidelines of six to 12 months fall within

3    zone B of the guidelines, this Court has the absolute discretion

4    under the guidelines to impose a sentence of probation that

5    includes as a condition home detention for imprisonment.  And

6    one day of home detention counts for one day of imprisonment.

7         And so that is the sentence that we have been advocating to

8    this Court from the beginning, is that the Court impose a

9    sentence of probation with a component of home detention for

10   whatever period of time this Court believes appropriate,

11   allowing the term and one day of home detention to satisfy for

12   one day of imprisonment, which is allowed under the guidelines.

13        And so just from a strictly analytical guideline approach,

14   I believe that that is one way that the Court can get to the

15   sentence for which we are advocating for Mr. Brodnax.

16        Separate and apart from whatever the guidelines say, as

17   this Court is very much aware, the Court -- the guidelines are

18   just one of seven factors that the Court has to consider under

19   18 U.S.C. 3553.  And I would remind the Court that that

20   sentencing statute directs the Court to impose a sentence that

21   is minimally sufficient to comply with the purposes of

22   sentencing that are listed in paragraph 3553(a)(2), which speak

23   to deterrence, incapacitation, and rehabilitation.  And so those

24   are also factors that the Court has to take into consideration.

25        Also, under 3553(a)(6), the Court has to avoid any kind of

sentencing disparity.  And I know and I appreciate the Court's indulgence of reading all the positions that have been filed in this case by the defense, specifically both in ECF 43 and in ECF 67, because what I have tried to lay out for this Court is how disparate the government's request is in this case.  It is simply completely off the mark as to all other government recommendations that have been requested in misdemeanor sentences.

Now, if the Court is to look at the chart that we appended to our most recent pleading, which is ECF 67, that chart lists every single case and the disposition of each one of those cases.  But separate and apart from that chart that we have, what that chart demonstrates is that approximately 30 percent of the cases have resulted in probation with home detention.

I would note that there was a recently released article on Friday that indicated that over 50 percent of the cases so far have been sentenced to nonincarceration sentences.

But what I think is significant to look at here is, first of all, I understand in some ways it's difficult for the Court because Mr. Brodnax pled without the benefit of a plea agreement.  And obviously, in other misdemeanor cases where people have pled with a plea agreement, the plea agreement has been plead to a petty offense capping at a six-month maximum penalty.

So Mr. Brodnax is in a slightly different category because

1    he now has a statutory maximum cap of 12 months, which puts him

2    in a little bit of a different situation.

3        But, Your Honor, I think what is significant is if you look

4    to how the government has treated other individuals who have

5    pled guilty to misdemeanor offenses and have serious criminal

6    records, which is, of course, a concern of, I think, both the

7    Probation Office and the government in those cases, in those

8    cases that are most analogous to Mr. Brodnax's, the requests of

9    the government don't come anywhere close to 18 months of

10   incarceration.

11       And I think perhaps one of the most analogous cases -- and

12   this was cited to the Court in our original pleading, which was

13   ECF 43, which was United States v. Bauer, which is 1:12-cr-49-1.

14   In that case the defendant was sentenced to 45 days of

15   imprisonment.  And he had his cousin, Hemingway, with him.  They

16   entered the Capitol.  They were inside for approximately 17

17   minutes.  Bauer and his cousin took selfies inside the Capitol.

18   They did not appear to engage in acts of violence or property

19   obstruction.

20       However, outside of the Capitol, they took this photograph.

21   And I will show you the photograph, Your Honor.  I think it's

22   relevant in this case.

23       Does the Court see it?

24           THE COURT:  Yes.

25           MS. MAGUIRE:  And I think this is relevant just

because this is the exact same vehicle that they are standing on
that the government included in their presentation to the Court.
And Mr. Brodnax is seated on top of this vehicle.  These folks
are standing -- one is standing, who, I believe, is Bauer.  The
man sitting, I believe, is his cousin, Hemingway.

But in that instance, both of those men had significant
felony prior criminal records.  In fact, I went through and read
the government's sentencing positions in each one of these
cases.  And I will just quote to the Court what is contained in
there.  But it basically says that Bauer and his cousin
Hemingway chanted "stop the steal" with the crowd.  Bauer told
the FBI, quote, I don't feel like I done nothing terribly wrong,
but I acknowledge -- I don't agree with some things that went
on.  Bauer went on to say that if he had been a cop in uniform
that day, quote, I would have been scared for my life.  While
inside the building, Bauer accomplished his goal of, quote,
occupying the space, end quote.  He joined a mob of people and
walked through the building from the Senate Wing Door into the
crypt, down the OAP hallway, and to the Memorial Door.  He took
photographs.

In his presentence report, it detailed Bauer's extensive
criminal history, dating back to 1999 when he was 21 years old.
By his own admission, from an early age, Bauer struggled with
drug and alcohol issues.  He told the PSR writer that he was a
meth cook from 2003 until his arrest and incarceration until

2006, that he started smoking marijuana when he was 11 years old and became a distributor of marijuana to kids in his community while in elementary school.  He has apparently attended numerous drug and alcohol treatment programs over the years but didn't feel that he needed treatment because he has not used methamphetamine or marijuana or OxyContin since 2006.

Additional arrests included operating of a motor vehicle, possession of ammonia, possession of methamphetamine, manufacture of methamphetamine, unlawful possession of methamphetamine precursor drugs.

And his cousin, Hemingway, had pled guilty in 2006 to sexual battery, and he had received three years' imprisonment, all but one year suspended.  His probation was revoked, and he was resentenced to five years of imprisonment and was in prison between 2008 to 2011.  And his parole term ended in 2013.

The point I make with those cases, Your Honor, is they were the ones that I could find that were most analogous in this instance to somebody who has a prior criminal record, somebody who, like Mr. Brodnax, walked into the building, I would say that those individuals differently than Mr. Brodnax.

I think Mr. Brodnax was even more peaceful than those individuals.  Mr. Brodnax did not come to Washington, D.C., to go to the Capitol or to disrupt the certification of the Electoral College.  He had no weapons with him.  He committed no violence.  He damaged no property.  He shouted no incendiary

comments or threats.  He is engaging in the very misdemeanor

conduct that the government used by their own criteria to choose

to charge him with a misdemeanor.

And I don't believe that his prior record should elevate

this case to a point where the government is asking for 18

months when in the case of Bauer and Hemingway the result was 45

days and 30 days respectively for almost identical conduct.

And it just makes me very concerned that the government is

treating Mr. Brodnax differently because he did not enter into a

plea agreement.  And as the Court knows from the cases that I

have cited to the Court, the fact that a defendant chooses to

plead straight up without the benefit of a plea agreement cannot

be used at sentencing to increase his punishment, which is

exactly what the government appears to be doing in this case.

Mr. Brodnax did not engage in any kind of behavior that

placed -- he did not conduct any property damage.  In fact, he

went into the Capitol.  As you can see from the videos that

Mr. Liebman shared, he was making videos.  He took pictures of

himself.  And he walked out.  He was in the Capitol for less

than 30 minutes -- sorry, less than an hour, and then he, of

course, came outside and took a picture of himself sitting on

the very vehicle that both Bauer and Hemingway appear to have

been on.  And that was the extent of it, Your Honor.

I also think what is important to understand about

Mr. Brodnax and also another factor that factors into what the

1    Court should do in this case is Mr. Brodnax's post-offense

2    rehabilitation.

3         As this Court knows, since Mr. Brodnax was in Washington,

4    D.C., in 2021, he has relocated to Dallas, Georgia.  And that

5    has probably been one of the most positive things that

6    Mr. Brodnax has done.  In many ways, it's changing the people,

7    places, and things, and Mr. Brodnax has done that.  He has moved

8    to Dallas, Georgia, where he is living with Ms. Yearwood.  He

9    has been gainfully employed throughout his entire time that he

10   has lived in Georgia.  And as this Court is aware from the

11   pleadings that have already been filed with this Court, he

12   recently changed jobs to Printpack, where he has gotten praise

13   from his supervisors.  He has gotten a raise.  He is a valued

14   employee.

15        And most importantly, he is now the sole financial support

16   for Ms. Yearwood and her three children and his own daughter,

17   Your Honor.  And those are serious responsibilities that he has.

18        The people who submitted character reference letters on

19   behalf of Mr. Brodnax talk about not only what a wonderful

20   father he is, and some of those comments are also contained in

21   the presentence report, but that he is a dedicated co-worker.

22   The letters in our original Exhibits 1 and 2 to our sentencing

23   position, ECF 36, talk about him as a dedicated co-worker,

24   somebody who goes above and beyond to complete his work.

25        We have already -- we have also just appended in our most

recent supplement to the Court in document 67 additional letters
from Ms. Yearwood, as well as another close friend who talks
about Mr. Brodnax's character and how he has been an amazing
role model.  Ms. Yearwood says he's been an amazing role model
for her family.  He has taken in her children as his own.  "He
has made it a point to be there and show a significant amount of
support, even when we relocated.  Then I suddenly became
unemployed.  He has been supportive during my sudden and arduous
job search.  He is currently the sole provider of our household,
as a source of camaraderie for both me and my family."

In addition, Your Honor, we have the letter from
Ms. Hoover, who talks about Mr. Brodnax as "a wonderful person
with an amazing personality.  Everyone that I've seen interact
with him was always positive.  He has made mistakes.  We all
have.  But his intentions are always to better himself."

And I think Mr. Brodnax has engaged in actions that speak
to that, that his desire is to better himself.  Now at age 40,
leaving behind the criminal history, the most recent being when
he was in his early 30s, Mr. Brodnax has now turned the corner
and is dedicated to his family and supporting his children and
wanting to move forward.

And so as the Court is aware from the Supreme Court's
decisions in both *Gall* and *Knight*, that home detention and
probation is clearly a restriction of one's freedom and liberty.
And we are not asking you to simply let Mr. Brodnax go free.  We

understand there has to be punishment imposed by the choices he made on January 6.

But in complying with 3553(a), which talks about what is the most minimally sufficient punishment to be imposed, we believe that that can be satisfied, Your Honor, through imposing a term of probation with a condition of home detention, and that could be anywhere between zero to 12 months of home detention where he would be on electronic monitoring, allowing him to go to and from his home, to allow him to continue to work, to allow him to continue to support his family, and allow him to demonstrate to this Court his post-offense rehabilitation.

The only other comment I would make, Your Honor, just in terms of responding to Mr. Liebman's presentation, is I think again his presentation shows what Mr. Brodnax did inside the Capitol, which was he was a part of a much larger crowd that was pushed along at various places, but he did not take any opportunity to damage any property or yell anything or make any threats and was simply posing for pictures and taking videos.

And then in terms of what was ever contained in the tracks on the album that was released, obviously, as the Court may or may not know through some of this, there were several memes that were placed on Instagram and social media when Mr. Brodnax was seen inside the Capitol.  His picture was on CNN almost immediately.  And there was a lot of feedback about a black person being inside the Capitol and being a part of this group

1   and people couldn't believe that a black person would be there

2   supporting Donald Trump.  So some of those comments that you

3   hear in those tracks on those videos are in response to things

4   that were placed on social media and memes that were on social

5   media.

6        And clearly, I think Mr. Brodnax realizes that they were in

7   poor taste and that joking about such a serious incident was not

8   really appropriate.  But I think that the Court can understand

9   that that was in a much larger context of memes and other things

10  that were circulating on social media at the time.

11       But obviously, I think that Mr. Brodnax, through this

12  almost two years now of being under court supervision, has

13  demonstrated to this Court that he is dedicated to his family,

14  he is dedicated to his work.  He is now the sole financial

15  support for them, and that he can, through a series -- through a

16  sentence of home detention, be punished for his involvement in

17  the Capitol on January 6.

18       So we are continuing to request that this Court impose a

19  sentence of probation with a condition of home detention for as

20  long as the Court believes is appropriate.

21            THE COURT:  Thank you.

22            MR. LIEBMAN:  Your Honor, may I respond just on the

23  legal issue about --

24            THE COURT:  You can respond on anything you want to

25  respond to.

1            MR. LIEBMAN:  Thank you, Your Honor.

2        So first of all, 5G1.2(d), it looks like there's maybe one

3    sentence, frankly, that might suggest that a fully concurrent

4    sentence for all of these counts is -- to the extent it is

5    required by the guidelines, is required in that respect, and

6    that's this sentence:  "In all other respects, sentences on all

7    counts shall run concurrently except to the extent otherwise

8    required by law."

9        The problem with having that sentence having an effect on

10   the counts in this case is that two of the counts are petty

11   offenses to which the guidelines don't apply at all.  So, in the

12   government's view, the maximum guideline-compliant sentence

13   would be one that's consistent with the guidelines for Counts 1

14   and 2, which is 12 months grouped together, plus the maximum

15   statutory sentence running consecutively for Counts 3 and 4,

16   which the guidelines are completely inapplicable to.

17       So in the government's view, the maximum

18   guideline-compliant sentence is a full two years of

19   imprisonment, which again is not what we're asking for.

20       As for the code provision, 18 U.S.C. 3584, I've always

21   understood that to be just a way of interpreting judgments of

22   conviction, which is if they don't say that sentences are

23   running consecutively, they are presumed to run concurrently.

24   It is not any sort of presumption in favor of imposing

25   concurrent sentences.

1        I do believe the appropriate total punishment here would be

2    18 months, Your Honor.  And again, for the reasons stated,

3    that's a guideline-compliant sentence.

4        As for the sentences in other cases, I have not had the

5    opportunity to go through and see what the guideline -- I'm

6    sorry, what the actual offense levels and criminal history were

7    for all of those in the table, but I would note, this defendant

8    is a category IV, and apparently, the highest misdemeanor

9    January 6 defendant the defense could find was category III.

10   Not only is he a category IV offender, Your Honor, he is at the

11   upper edge of category IV.  Category IV applies to defendants

12   with criminal history points of 7, 8, or 9.  This defendant has

13   9.

14       That is a reason for this Court to sentence, again if the

15   Court chooses to be guideline compliant, as we think the Court

16   should be, at the upper end of the guideline-compliant sentence,

17   at least for Counts 1 and 2.

18       So for -- and regarding the tracks on the album, I'm sure

19   when Mr. Brodnax has a chance to speak, he probably will say

20   they were in poor taste.  But the tracks that I played have

21   nothing to do with the issue of people being surprised about a

22   black man being a Trump supporter inside the Capitol on the day

23   of the riot.  They are him bragging and boasting about having

24   been there and saying quite revealingly that he was there

25   because he felt like it.  And that is something the Court should

1    factor into punishment in this case.

2         Thank you, Your Honor.

3              THE COURT:  Ms. Maguire, anything you want to say

4    further?

5              MS. MAGUIRE:  No, Your Honor.  Thank you.

6              THE COURT:  Ms. Baker, anything you want to say on

7    behalf of Probation?

8              PROBATION OFFICER:  Not at this time, Your Honor.

9              THE COURT:  Okay.  Thank you.

10        So I will hear from Mr. Brodnax, if he would like to be

11   heard.

12             THE DEFENDANT:  Well, yeah, there are some things

13   something I wanted to say to you before you sentenced me or

14   whatever.

15        So first of all, I would like to start by saying that I do

16   deeply apologize for the events that took place on and in the

17   nation's Capitol and give my strongest condolences to the law

18   enforcement officers or anyone's family members that was hurt or

19   lost their lives trying to do their jobs protecting our

20   government and those who had no violent intention.

21        As for me, I never knew that me entering out of curiosity

22   would have gotten me into this much trouble that I solely regret

23   since the day that it started.  I've waken up every day wishing

24   I was never in D.C. to begin with, let alone going inside of the

25   building, for it was way more serious than I could ever imagine.

So once again, I truly apologize.

But despite, you know, negativity that took place on that day, you granted me post-offense rehabilitation to help me to focus more on being a better person and loved one than I could ever be.  So for that, I am forever grateful.  You allowed me to move far away from some of the memories and distractions which were hindering.

I've moved to Georgia where I've obtained a wonderful job as to where I prove to everyone, along with myself, how much of a hard-working and reliable person that I am.  I've accomplished a lot working for the company that I work for now.  I've also been given raises within the time I've been there, which people that have been there for years haven't even worked hard enough to get, which also explains the level of my performance.

After receiving a raise of $3.16, I was also given an additional bonus of $249 as a gesture from my company to show their appreciation of my ongoing reliability and hard work, because I've gone over and beyond.

I would like to stress to you the important role I play in the lives of the -- of those in my household and family, which I'm the sole provider, raising four beautiful young girls, three who live here with me now and my one daughter that lives in Richmond, Virginia, who is depending on me to be there every step of the way as a father and a protector, and I would never want to hurt them more than I have already done.

1          So during this time, I would like to ask for your mercy and

2     leniency with sentencing.  I've been -- accepted responsibility

3     for my actions.  I remained in compliance during the almost two

4     years of my pretrial, despite, you know, the traffic incident,

5     and I have showed that I'm not a person that will have to be

6     thrown in jail.

7          And though I understand a punishment will have to be put in

8     place, I just pray that it's probation or home detention where

9     I'm still able to go to and from work so that I can continue to

10    take care of my bills and raise my kids, who will be devastated

11    if I had to go away.

12         And I would like to thank you in advance for whatever

13    decision you choose to make, and once again, I truly apologize.

14    I just wanted to tell the Court so you can see how I feel about

15    the situation.

16              THE COURT:  Thank you, Mr. Brodnax.

17              THE DEFENDANT:  Thanks for letting me share.

18              THE COURT:  Anybody else have anything you want to

19    say?

20              MS. MAGUIRE:  No, Your Honor.

21              MR. LIEBMAN:  No, Your Honor.  Thank you.

22              THE COURT:  All right.  Sentencing is always

23    difficult.  And as I said, I've read everything.  I've

24    considered everything, the most recent letters from his wife or

25    girlfriend and his employer and friends, his background growing

up and the problems of his youth, his employment history.  I've

read the good and the bad about his background, obviously.  It's

all been laid out.  And I've considered carefully what everybody

has had to say.

And there's certainly some conflicting things and

incongruous things about Mr. Brodnax, some of which can be

attributed to mistakes when he was young, some of them fairly

serious mistakes when he was young.  When he was 18 years old,

possession of controlled substances, but also a robbery,

according to the records received from the Eastern District of

Virginia, a robbery involving someone being held up at gunpoint.

He was 18 then.  He's now 40.

When he was incarcerated, the length of disciplinary

violations goes on and on and on and on, according to the

report, page 11 of the presentence report.  He could not comply

with the conditions of his incarceration.

Then we have possession of a firearm when he was 22, after

having been convicted previously of a felony, namely the

robbery.  When he was on supervision, it's reported by the

Eastern District of Virginia's Probation Office that his

adjustment to supervision has been marginal at best.  He got a

job but was terminated for insubordination.  Who knows what the

facts are surrounding that.

There's also discussion of his involvement in some

incidents while he was on probation.  And he was arrested for

1    violations of terms of probation, remained in custody for a

2    period of time, and his supervised release was revoked, and he

3    was sentenced to 24 months for violation of conditions, some of

4    which appear, from what I'm reading, to have been quite serious,

5    and that was in 2008 or 2009.

6        And then in 2016, when he was 33, seven years ago, he pled

7    guilty to controlled substances, drugs, sentenced to five years,

8    all of which was suspended, sentenced to seven years' probation.

9    While incarcerated this time, he completed a number of

10   educational courses.

11       But unfortunately for him, he was still on probation from

12   that drug case in Henrico County when he committed -- when he

13   entered the Capitol on that day and committed these misdemeanors

14   to which he pled guilty and admitted his responsibility.

15       But all of that prior history comes back to add to the

16   criminal history points that he has.

17       One of the things that comes out from reciting the history

18   is that he's had a problem historically in complying with

19   conditions that are set for him.  In prison, he has all these

20   disciplinary violations.  And we all know that sometimes those

21   disciplinary violations are not the individual's fault.

22   Sometimes, the prison authorities overreact.  Sometimes, another

23   person instigates things, and the other person reacts, and they

24   both get disciplined for it.

25       But his conditions of release, supervision, and probation,

not compliant.  Revoked, incarcerated because of violation of conditions.  And so we have that; I have that to consider.

On the other hand, there is what has been recounted in terms of his -- the new life he has created for himself, begun to create for himself in Georgia with a relationship that's important and her three children and his daughter being important to finally at the age of 40 putting him on what he says is a path to turn his life around and to meet his responsibilities both to his employer, who gives him high marks, and his family, who needs him.  And that's all to the good, and that's important.  And I recognize that.

But I also recognize that he's got a re-arrest on supervision, for a minor thing but still a re-arrest, and a number of violations of supervised release and probation in prior cases, and the disciplinary matters that I mentioned while incarcerated.

And so there are three -- Ms. Maguire points out the factors that I am supposed to consider in imposing sentence. And the sentence is up to me.  Counts 1 and 2 are guidelines, six to 12 months.  They're grouped because of the reasons I said earlier.  Maximum guideline, 12 months, adding them together, 12 months, because they're grouped.  The class B misdemeanor, Counts 3 and 4, six months maximum.

So under 3553(a) and (e), I think that the most important factors to look at are three:  The history and characteristics

of Mr. Brodnax, general deterrence, and specific deterrence.

The history and characteristics, I've already discussed. He's got a lot of things going for him now that he didn't have going for him a couple of years ago, stability in his work, which he's almost always been employed, stability in his work in Georgia, stability in his family life in Georgia.  But he's also got a criminal history, multiple felony convictions, noncompliance with conditions of release over time.  And that's what we have.

General deterrence, this comes up in every single one of these cases, and admittedly, a large number of misdemeanor cases result in probation.  But the attack on the Capitol was an attack on the rule of law, an attack on the democratic process, an attack on one of the branches of government which could have proved deadly to members of Congress and could have disrupted, and the goal of which was to disrupt, the certification of the electoral votes and the formalization of the election of the president.

And this is something that -- where a message has to be sent to other like-minded people for the future and the world at large and the country at large that this is not going to stand. And probation should not be the presumptive default sentence when we have such an attack on our democracy and the rule of law.

On the other hand, Mr. Brodnax did not engage in violence

himself, did not push or touch -- he may have been pushed into
other people but did not push or touch or harm or assault a
police officer and did not destroy property.

As for specific deterrence, I have to look not just at
since he's move to Georgia.  I've got to look at the whole
picture from January 6 on.  We already know, because I went over
it at length earlier, that he obstructed the administration of
justice by destroying the videos on his phone and his conduct
from January 15 when he was interviewed, 2021, to March of 2021
is an indication that he had not shown a lack of remorse during
that period of time.  And he didn't know, of course, whether he
was going to plead or go to trial, but he knew that something
was going to happen, that he was likely to be charged with a
crime.  And we have that.

And then we have what the government calls as profiting
from his offenses.  But what we know at the very least from the
things that were shown on the screen here and are included in
the government's filings, that he took this picture on the hood
of a Capitol Police vehicle and later used this image on the
cover of his rap music album.  And that was in March, I believe,
of 2021.

So he's interviewed by the police, by the agents in January
2021.  He destroys his videos.  He makes a rap album, has two
tracks on the album that relate to the Capitol.  He says he
entered the Capitol because he felt like it and laughed.  And

1   that's March 4th of 2021, that he issues -- or that the rap

2   album comes out, I think, and it's entitled something like

3   Bugzie the Don and The Capital, on all platforms.  And that's

4   the album cover, and it's still being advertised on Twitter.

5        So, you know, I consider all of those things.  And I

6   understand the defense argument that a lot of what should be

7   accomplished to properly balance general deterrence, specific

8   deterrence, lack of remorse to a point against his now turning

9   his life around and being quite responsible in his new community

10   and quite important to those who rely on him.  I understand the

11   argument, that that could be accomplished with probation, plus

12   home confinement.  But I don't think it serves all the purposes

13   of sentencing, and I don't think that it takes account of his

14   prior history of compliance with conditions and his lack of

15   remorse, at least from January 6, 2021, through March of 2021

16   and beyond.

17        And so pursuant to the sentencing -- so what I'm going to

18   do -- yes.  So pursuant to the Sentencing Reform Act and in

19   consideration of the factors laid out in 18 United States Code

20   Section 3553, as well as the guidelines, which are advisory, I'm

21   going to sentence Mr. Brodnax to the custody of the Bureau of

22   Prisons for five months, five months on Count 1, five months on

23   Count 2, five months on Count 3, five months on Count 4, all of

24   the counts to run concurrently.  1 and 2 are grouped, in any

25   event.  That's five months.  They're concurrent to each other.

1   And the five months each on 3 and 4, concurrent to each other

2   and to Counts 1 and 2.

3        In addition, once he completes his time in jail -- and he

4   will be allowed to voluntarily surrender when he hears from the

5   Bureau of Prisons -- he is sentenced to serve a period of 12

6   months of supervised release as to Counts 1 and 2 to run

7   concurrently and nothing further with respect to Counts 3 and 4.

8        In addition, he's ordered to pay a special assessment of

9   $70, which is comprised of $25 each as to Counts 1 and 2, $10

10  each as to Counts 3 and 4, all of which are required by law.

11       While on supervision, the following mandatory conditions

12  will apply:  You must not commit another federal, state, or

13  local crime.  You must not unlawfully possess a control

14  controlled substance.  You must refrain from any unlawful use of

15  a controlled substance.  You must submit to one drug test within

16  15 days of placement on supervision and at least two periodic

17  drug tests, if necessary, as determined by the Probation Office.

18  And you must apply with -- comply with any restitution orders

19  under the restitution statutes.  And I will impose restitution.

20       In addition, you have to comply with the standard

21  conditions of supervision.  And under the recent decision under

22  the D.C. Circuit in *United States v. Matthews*, unfortunately, I

23  have to read them.  I have to be on the record since they

24  weren't previously provided to counsel and Mr. Brodnax.

25       One, you must report to the Probation Office in the

judicial district where you are authorized to reside within 72

hours of the time you were sentenced or within 72 hours of the

time of imprisonment unless the probation officer in Georgia

instructs you to report to -- well, unless our probation officer

instructs you to report to a different probation office, and

that will be in Georgia.

Second, after initially reporting to the Probation Office,

you will receive instructions from the probation officer about

how and when you must report to Probation, and you will receive

instructions going forward from both the Bureau of Prisons and

Probation and your own lawyer about where and when you should

voluntarily surrender to begin your period of imprisonment.

Third, you must not knowingly leave the federal judicial

district where you are authorized to reside without first

getting permission from the Probation Office.

Fourth, you must truthfully answer questions asked by your

probation officer.

Five, you must live at a place approved by the probation

officer.  If you plan to change where you live or anything about

your living arrangements, including people you live with, you

must notify the probation officer at least ten days before the

change or, if it's not possible to do so, then within 72 hours

of becoming aware of the change or expected change.

Six, you must allow the probation officer to visit you at

any time at your home or elsewhere, and you must permit the

probation officer to take any items prohibited by the condition
of your supervision that the officer observes in plain view.

Seven, once you're released from prison or on supervised
release, you must work full-time, at least 30 hours a week, at a
lawful type of employment, unless the Probation Office excuses
you from doing so.  If you do not have full-time employment at
that point, you must try to find full-time employment, unless
the Probation Office excuses you from doing so.

If you plan to change where you work or anything about your
work, you must notify the probation officer at least ten days
before or, if that's not possible, within 72 hours of becoming
aware of it.

Number eight, you must not communicate or interact with
someone you know is engaged in criminal activity.  If you know
someone has been convicted of a felony, you must not knowingly
communicate or interact with that person without getting
permission from Probation.

Nine, if you're arrested or questioned by a law enforcement
officer, you must notify the probation officer within 72 hours.

Ten, you must not own, possess, or have access to a
firearm, ammunition, destructive device, or dangerous weapon
that has anything that was designed or was modified for the
specific purpose of causing bodily injury or death to another
person such as nunchakus or Tasers or any guns or other
dangerous weapons or firearms.

1        11, you must not act or make any agreement with a law

2   enforcement agency to act as a confidential human source or

3   informant without first getting permission from the Court.

4        12, if the probation officer determines you pose a risk to

5   another person, the probation officer may require you to notify

6   that person about the risk, and you must comply with that

7   instruction.  The probation officer may contact the person and

8   confirm that you've notified the person about the risk.  It

9   probably doesn't apply in this case.

10       13, you must follow the instructions of the probation

11   officer related to the conditions of supervision.

12       Okay.  Those are the, quote unquote, standard conditions of

13   supervision.

14       In addition, the following special conditions:  One, during

15   your period of supervised release, you must stay away from the

16   District of Columbia and metropolitan -- D.C. metropolitan area.

17       You must participate in an inpatient or outpatient

18   substance abuse treatment program and follow the rules and

19   regulations of the program if the probation officer believes you

20   must do so and need it.  It's up to them.  The probation officer

21   will supervise your participation in any such program.

22       You must submit to substance abuse testing once to

23   determine if you've used a prohibited substance and periodically

24   at the discretion of the Probation Office.  You must not attempt

25   to obstruct or tamper with the testing methods.

1    You shall remove firearms, destructive devices, or other

2    dangerous weapons from areas over which you have access or

3    control until supervision requires.

4    You must provide the Probation Office with access to any

5    requested financial information and authorize the release of any

6    financial information which may be shared with the Financial

7    Information Office with the U.S. Attorney's Office.  And that's

8    because I've already imposed $70, required special assessments,

9    and I will impose restitution.

10    There's something in here, Sherry, about a re-entry

11    program.  We don't do that in most cases; right?

12    PROBATION OFFICER:  Correct, Your Honor.  It's up to

13    the Court if the Court feels that a re-entry progress hearing is

14    warranted.

15    THE COURT:  No, I don't believe so.

16    With respect to financial obligations, I've mentioned the

17    $70 special assessment.

18    Two, I find you do not have the ability to pay a fine.

19    Therefore, I will waive the fine.  You are ordered to make --

20    and I will also waive interest on the $70 and on restitution,

21    because you can't afford it.

22    But you are ordered to make restitution to the Architect of

23    the Capitol in the amount of $500.  I've determined you do not

24    have the ability to pay interest, and therefore, I will waive

25    it.  The amount of restitution is $500, payable to the Architect

of the Capitol, and if you cannot pay that amount immediately,
it will be due $50 a month once you are released from jail and
are on supervision.

And the Probation Office may release this to any treatment
facilities, and you need to notify the Court of any change in
your address until your financial obligations are met.

Other than notice of appeal and other things, Ms. Baker, is
there anything I've forgotten?

PROBATION OFFICER:  No, Your Honor.

THE COURT:  Mr. Liebman, anything you can think of?

MR. LIEBMAN:  No, Your Honor.

THE COURT:  Ms. Maguire?

MS. MAGUIRE:  No, Your Honor.

THE COURT:  And obviously, I said this before, I will
say it again.  You're on the current conditions of release until
you're notified to voluntarily report to begin your period of
incarceration.  And you will hear I don't know how quickly.  It
depends, in part, on what the Bureau of Prisons decides.  I
assume you'll be directed to report somewhere near your home in
Georgia, and it may be a state or local institution rather than
a Bureau of Prisons facility, given the length of the sentence
I've imposed.

Finally, you have a right to appeal the sentence I've
imposed, Mr. Brodnax, for any reason, because there's no appeal
waiver, if the sentence is above the statutory maximum, which

it's not, if it's above the guidelines, which it's not, or for any other reason, on any legal issues I decided, on any guidelines issues I decided, and on the sentence itself.

And you also have the right to challenge your conviction on a collateral attack, as we call it, under 28 U.S.C. 2255. Later on, if any information you do not now know becomes available or you want to claim ineffective assistance of counsel or you want to claim any issues relating to the nature of the plea or plea proceedings or the sentencing or sentencing proceedings, you may do so.

And if you're unable to afford the cost of an appeal or collateral attack, you may request permission from me, and I will appoint someone to represent you if I find that you can't afford that.

If you want to file an appeal, you must do so within 14 days, or you lose your right to do so. And if you tell Ms. Maguire you want to file a notice of appeal, if you want to appeal, she will, as an officer of the court, file that notice of appeal and then advise you if she can represent you further or not and, if so, discuss with you appellate issues you may want to raise.

The only other thing I have to ask or to say is to ask counsel, under the U.S. Court of Appeals' *United States v. Hunter*, 809 Fed.3d. 677, are there any objections to the sentence, to the sentencing proceedings that any counsel wants

1   to put on the record that they have not already had the

2   opportunity to place on the record in this case?

3           MR. LIEBMAN:  Nothing from the government, Your Honor.

4   Thank you.

5           MS. MAGUIRE:  Nothing from the defense, Your Honor.

6   Thank you.

7           THE COURT:  Anything anybody else wants to say?

8           MS. MAGUIRE:  No, Your Honor.

9           THE COURT:  Other than that, Mr. Brodnax, I know

10  you're disappointed with the sentence, but I wish you the best,

11  and I wish you the ability to resume what you say your efforts

12  are and have been and will continue to be, never to be seen by

13  any other judge, and to continue your work, your employment,

14  your life in your new community with your family once your

15  period of incarceration is behind you.

16      Unless there's anything else, thank you, all, and we are

17  adjourned.

18          (Proceedings adjourned at 12:29 p.m.)

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER


        I, Sara A. Wick, certify that the foregoing is a

correct transcript from the record of proceedings in the

above-entitled matter.


        Please Note:  This hearing occurred via telephone or

video conference and is, therefore, subject to the

technological limitations of court reporting remotely.



/s/ Sara A. Wick_____        February 11, 2023_____

SIGNATURE OF COURT REPORTER             DATE